The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Larry Edward LeMASTERS, Defendant-Appellant.

No. 81CA0872.

Colorado Court of Appeals, Div. II.

Feb. 17, 1983.

Rehearing Denied March 17, 1983.

Certiorari Granted June 13, 1983.

---

1. Count 5 charged the defendant with careless driving, section 42–4–1204, C.R.S.1973 (1982 Supp.).

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sp. Asst. Atty. Gen., John M. Hutchins, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Berkley Rasband, P.C., Berkley Rasband, Englewood, for defendant-appellant.

BERMAN, Judge.

Defendant, Larry LeMasters, appeals a judgment and jury verdict finding him guilty of first degree burglary, second degree burglary, criminal attempt to commit aggravated robbery, second degree assault, and menacing. We affirm.

On a snowy day in November of 1980, the victim was interrupted by the doorbell while talking with a friend on the telephone. Before opening the door she asked the man outside what he wanted, and he explained that one of his co-workers had fallen from the scaffolding at a nearby construction site and he needed to call an ambulance. The victim let the man in, then hung up the phone, asking her friend to call back in two minutes.

The man explained that he needed to call the home office for authorization before sending for an ambulance. After dialing a few times he told the victim he was unable to get through. The man asked for a glass of water, which the victim provided. He replaced it in the sink and asked to use the restroom. While defendant was in the restroom, the victim became apprehensive and placed a kitchen knife on the counter next to her.

After making one more attempt at reaching the home office, the man turned and lunged at the victim with a knife. A struggle ensued during which the victim managed to activate a silent alarm. She told her attacker that he had better leave because the police would soon be coming. After the man demanded money, the victim reached for her purse and made a run for the garage. She was able to activate the automatic door opener and began screaming loudly. The man fled.

The victim reentered the house and attempted to call for help, but the line had been cut. She then ran into the street to flag down a van. The driver told her to get in and they followed the man's car, as a result of which they were able to obtain the license number and the car's description.

Defendant's arrest and conviction followed. Defendant's appeal is based on the contentions that evidence was improperly admitted and that he was denied his right to effective assistance of counsel. We affirm.

I.

Defendant first argues that a hood and sweater of his, which were suppressed as a result of an invalid search, were improperly

introduced for impeachment purposes. We disagree.

Here, the trial court properly admitted pieces of defendant's clothing which had been described by the victim to impeach the defendant's testimony that he was not at the victim's home on the day in question. The defense argues that because the defendant specifically admitted owning the articles of clothing, there was nothing to impeach.

■ In *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), the Supreme Court held that evidence suppressed as the fruit of an unlawful search and seizure may nevertheless be used to impeach a defendant's false trial testimony, given in response to proper cross-examination, even where the evidence does not squarely contradict the defendant's testimony on direct examination. It is not necessary that the matter be expressly mentioned on direct; rather, it is permissible to use the impeachment evidence if the direct examination suggests the question to a reasonably competent cross-examiner. This exception has been made because a court's overriding concern is to arrive at the truth and not permit a defendant to base his case on perjured testimony.

■ The items were not offered to impeach a statement as to ownership. Rather, they were offered to impeach defendant's statement that he was not at the victim's house on the day of the crime. When asked on direct examination by his counsel, "Mr. LeMasters, on November 24, 1980, were you at the Weilly residence?" the defendant replied "No, I was not." The trial court properly interpreted *Havens* to allow cross-examination regarding the clothing defendant was wearing on the day of the crime because it contradicted the alibi defense introduced during direct examination of defendant.

## II.

Defendant next contends that evidence concerning two test drives used to corroborate distances between stops the defendant made on the morning of November 24, and the time necessary to drive those distances was improperly admitted.

The first test drive was conducted on February 27, 1981, in response to defendant's written notice of alibi provided pursuant to Crim.P. 12.1. Defendant claims that because the roads were dry during the test drive, whereas on the day of the incident they were snowpacked, the test conditions were dissimilar and, thus, the test had no probative effect. However, the officer testified that he drove slowly to compensate for the difference in weather conditions on the two days.

■ Moreover, minor variations, such as weather conditions, have been held to affect only the weight but not the admissibility of similar tests. *People v. McCombs,* 629 P.2d 1088 (1981); *People v. Sexton,* 192 Colo. 81, 555 P.2d 1151 (1976). Whether or not test conditions are substantially similar to those being recreated is a matter for the trial court's discretion, and any doubts concerning test reliability may be adequately explored on cross-examination. *People v. Bastardo,* 191 Colo. 521, 554 P.2d 297 (1976). Thus, we see no error in the trial court's ruling.

The second test was performed because, during the trial, the defendant's testimony was inconsistent with his previous written alibi statement as to the hours he claimed he spent at each location. Defendant contends that this second test drive was also inadmissible because the results of the drive were not provided in the normal course of discovery and that this violated the prosecution's constitutional duty to disclose evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We disagree.

■ First, it was not possible to provide defendant with the results of the second test drive in the normal course of discovery because it was performed during the trial itself. Moreover, defense counsel did not act properly to preserve defendant's objection to the introduction of testimony regarding the test drive. The defense al-

lowed the testimony to be fully read into the record and made no contemporaneous objection. Only after the witness was through testifying did the defense make any sort of an objection at all, and it was in the form of a motion for a mistrial, which was denied. If defense counsel wished to examine the results of the second test drive, he need only have moved for a continuance. This he failed to do. Under these circumstances, we do not perceive a constitutional violation under *Brady.*

## III.

Defendant's third contention is that the prosecution did not establish a proper chain of custody for fingerprint evidence taken from the water glass in the victim's house. We disagree.

■■■ The testimony of an officer in charge of the property room established where, and in whose custody, the prints were at all times. Defendant's arguments, *inter alia,* that the envelope containing the prints was unsealed, constitute no more than mere speculation as to tampering. Mere speculation is insufficient to establish a break in the chain of custody. *People v. Gomez,* 632 P.2d 586 (Colo.1981).

## IV.

Defendant further claims that the fingerprints should not have been admitted because, once the prints were lifted, the glass was returned to the victim. Defendant claims that the returning of the glass to the victim destroyed the evidence, making it unavailable for him to conduct independent tests, and constituted a violation of due process under *Garcia v. District Court,* 197 Colo. 38, 589 P.2d 924 (1979). Not so.

*Garcia* provides a three-part test to determine whether a due process violation has occurred when evidence is lost or destroyed:

"(1) whether the evidence was suppressed or destroyed by the prosecution; (2) whether the evidence is exculpatory; and (3) whether the evidence is material to the defendant's case."

We hold that the first part of the *Garcia* test is not satisfied in this case because the evidence was not actually destroyed. Even though the glass was unavailable, the defendant had the opportunity to examine the prints themselves, and a court-appointed expert was provided for this purpose.

This case is not analogous to *Garcia* which involved the destruction of a breathalyzer sample taken to establish driving under the influence. Once the breath sample in *Garcia* was destroyed, the ability to conduct independent testing was also destroyed. Here, the defendant was still able to examine the actual prints as lifted from the glass.

Moreover, in *Garcia,* "the defendant . . . presented competent evidence that a separate breath sample could have been independently tested and the results of that test used to 'impeach' the 'testimony' of the machine which tested his breath." Here, although a fingerprint expert was provided to defendant, that expert did not testify concerning the feasibility of independent tests. The court, thus, had no way to determine whether a second set of prints could have been lifted from the glass and independently tested.

■■■ Further, the third prong of the *Garcia* test is also not satisfied in this case. The standard for determining materiality is whether the evidence could have affected the outcome at trial in light of the other evidence presented. *People v. District Court,* 656 P.2d 1287 (Colo.1983). *See also People v. Shaw,* 646 P.2d 375 (Colo.1982). We conclude that, in light of the other evidence presented at trial—photographic and in-court identifications of the defendant and his clothing, descriptions of the car and license plates, and inconsistent alibi stories—evidence gained from a second lifting of fingerprints would not have affected the outcome of the trial.

■■■ Defendant also argues that it was error for the trial court to allow the prosecution to offer a similar glass into evidence because under *Hampton v. People,* 171 Colo. 101, 465 P.2d 112 (1970), such

evidence was highly prejudicial to the defendant. We find no merit in this argument. The prosecution used the glass simply to show the jury how a fingerprint expert lifts a print from such a surface. It is within the discretion of the trial court to admit models for purposes of demonstration. *Hampton, supra.* Moreover, defendant has established no prejudice resulting from the admission of the glass.

## V.

■ Defendant's final argument is that the failure of his prior counsel to interview alibi witnesses in a timely manner denied his right to effective assistance of counsel. Again we disagree. Ineffective assistance of counsel is not established merely through failure to interview potential alibi witnesses within two weeks after the preliminary hearing. *See People v. Grant,* 40 Colo.App. 46, 571 P.2d 1111 (1977) (failure to interview witnesses within 6 days after preliminary hearing not prejudicial).

Judgment affirmed.

STERNBERG, J., concurs and specially concurs.

SMITH, J., dissents.

STERNBERG, Judge, concurring and specially concurring:

I am in complete agreement with the majority opinion: the hood and sweater were properly used to impeach defendant's testimony that he was not on the premises on the day in question. A defendant's privilege to testify on his own behalf does not extend to allowing him to perjure himself with impunity. *See Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

However, even if *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) is to be given as narrow an interpretation as the dissenting opinion argues for, nevertheless, I would hold that the evidence in question was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In this regard, the evidence of defendant's presence at the scene was overwhelming. One cannot read the record without concluding that the jury verdict was correct, even without the disputed impeachment evidence. Not only was there identification testimony by the victim and another witness, but also defendant's fingerprint on the glass in the victim's home proved that he was on the premises at the time in question. *See Cannito & Konder v. Sigler,* 449 F.2d 542 (8th Cir.1971) (error, if any, in receiving into evidence guns previously suppressed held to be harmless because of eyewitness identification and other evidence of guilt); *United States v. Manning,* 440 F.2d 1105, 1106 (5th Cir.1971) (evidence of defendant's participation in a bank robbery was overwhelming; thus error, if any, in admission of an incriminating airline coupon was harmless). *See also Young v. Maryland,* 455 F.2d 679 (4th Cir.1972).

Thus, in any event, the conviction should be affirmed.

SMITH, Judge, dissenting:

I respectfully dissent.

Although I concur with all but one part of the majority opinion, I nonetheless feel compelled to dissent vigorously to the rule announced in Section I thereof.

In my view, the majority has, in effect, abolished the exclusionary rule, as to every criminal defendant who enters a plea of not guilty, and elects to testify in his own defense. While I am not convinced either of the efficacy or of the wisdom of the exclusionary rule, it is, and has been, the law of the land, since first adopted for federal courts in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and has been applicable in state courts since *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1960) was decided.

It is true that commencing in *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) and in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the United States Supreme Court began carving out areas of exceptions to

the rule. I do not believe, however, that the Supreme Court, by its pronouncements in *Walder,* or in *Harris* and its progeny, intended that the "impeachment" exception ultimately supersede the rule itself.

The effect of the majority opinion here is to sanction admission of evidence, previously suppressed as having been obtained in violation of defendant's constitutional rights, for the sole purpose of establishing a defendant's guilt. This they do under the guise of "impeaching" LeMasters' denial of any involvement in the crime.

Impeachment, in the evidentiary context, has been traditionally defined as the adducing of proof that a witness who has testified in a cause is unworthy of credit or belief. *Johnston v. Belk-McKnight Co.,* 188 S.C. 149, 198 S.E. 395; *State v. Roybal,* 33 N.M. 540, 273 P. 919; *see also Tarling v. People,* 69 Colo. 477, 194 P. 939 (1921), and *People v. Wilkinson,* 37 Colo.App. 531, 555 P.2d 1167 (1976). In this sense, impeachment evidence is limited to that which will directly and specifically disprove a witness' statements and such evidence has been almost exclusively limited to prior inconsistent statements. *See* CRE 613. Admittedly, in some rare cases, evidence of an indisputable fact has been allowed as impeachment evidence where the existence of that fact totally discredits the witness' testimony, and thus proves him unworthy of belief. *See, e.g., United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). All other evidence tending to disprove a witness' testimony is merely rebuttal evidence and must meet the same admissibility standards as any other evidence in the case.

Proceeding from *Walder,* the Supreme Court in *Harris, supra; Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); and more recently, *United States v. Havens, supra,* has permitted the admission of suppressed evidence *only* under a narrowly defined set of circumstances for the express purpose of impeachment. *See U.S. v. Hinckley,* 529 F.Supp. 520 (D.D.C.1982) and *People v. Casper,* 631 P.2d 1134 (Colo. App.1981).

In each case of the *Harris, Hass,* and *Havens* trilogy, the Supreme Court justified the impeachment exception to the exclusionary rule by reasoning that the interests of deterrence were served by precluding the prosecution from utilizing illegally obtained evidence in its case-in-chief as well as during the defendant's case, *unless* to do so would countenance perjury. *See New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), and *Harryman v. Estelle,* 616 F.2d 870 (5th Cir.1980).

In *Harris, supra,* defendant was charged with selling a narcotic drug, to-wit, heroin. On his direct testimony he specifically denied selling *anything* to a particular police officer witness. For the purpose of impeaching that specific statement, the prosecution was allowed to introduce defendant's previously suppressed inconsistent statement in which the defendant admitted selling two glassine bags containing baking soda to the police officer. In *Hass, supra,* which was also a narcotics case, defendant expressly denied, on cross-examination, any knowledge of the source of certain drugs which had been admitted into evidence. The prosecution there was permitted to introduce a previously suppressed inconsistent statement given by the defendant in which he described, in detail, the source or sources from whence the drugs came. In *Havens, supra,* a drug case also, defendant, on cross-examination, denied any knowledge of a T-Shirt onto which patches cut from another T-Shirt had been sewn for the purpose of carrying drugs, and likewise, denied any knowledge of, or possession of, any T-Shirt so involved. The prosecution, in that case, in order to prove the defendant's statement was perjured, was permitted to introduce a previously suppressed T-Shirt taken from defendant's luggage in an unlawful search, from which the patches which were sewn onto his co-defendant's T-Shirt had been cut.

In each of these cases, previously suppressed evidence was allowed to be admitted for the limited purpose of attacking the defendant's credibility by demonstrating the falsity of specific statements made by him, either in direct or cross-examination.

These cases are thus clearly distinguishable from the one at bar.

In the case before us, the prosecution blatantly admits that the only testimonial statement sought to be impeached was that made by LeMasters on direct examination denying any involvement in the crime. The evidence which they sought to introduce consisted of a parka hood, a sweater, and a knife, seized from defendant's car or home as a result of an unlawful search, and suppressed at an earlier hearing. It should be noted that the victim's primary means of identifying her assailant was by the clothing he wore and the weapon used. LeMasters did not deny either ownership or possession of these items.

The district attorney, at a hearing out of the presence of the jury, expressed his theory in these words:

> "So far as the hood is concerned, Judge, I think it would be proper cross-examination on my part to ask the defendant if he owns a hood that goes with that parka and to go into that area, and to have him identify the particular hood, for impeachment purposes, *because on the direct examination by the defendant there has been a denial of his involvement in this crime.* There has been testimony that— by Mrs. Weily that the defendant was wearing a hood on the 24th of November, and there has been a description of that hood. *I think it is fair cross-examination and proper cross-examination to bring that out as relates to impeachment.*
>
> The same would go for the knife and the sweater." (emphasis added)

Prior to returning the jury, the trial court held that under its interpretation of *Havens, supra,* the prosecution would be permitted to do as it had requested. Upon resumption of the trial the following colloquy occurred between the district attorney and the defendant, LeMasters, on cross-examination.

> "Q. Now, Mr. LeMasters, you heard Nancy Weily testify; did you not?
>
> A. Yes, I did.

> Q. And you heard her testify you were in her house on November 24, last November; right?
>
> A. Yes.
>
> Q. And [that] you attacked her with a knife. You heard that; didn't you?
>
> A. Yes. I did.
>
> Q. And she testified that you were wearing a parka just like this. You heard that; didn't you?
>
> A. Yes.
>
> Q. And you denied any involvement in this; is that correct?
>
> A. Yes, that's correct.
>
> Q. That is, in fact, your parka; isn't it?
>
> A. Yes, it is.
>
> Q. Do you own a hood that goes with it?
>
> A. When I purchased it there was a hood with it, yes.
>
> MR. SELL; The record should reflect I am breaking a seal on the box.
>
> MR. RASBAND: [defense counsel] At this time I am going to object to any questions about this hood. It is my understanding that Mr. Sell was to inquire for impeachment purposes in regard to the hood. Mr. LeMasters has already testified that he had a hood that came with the jacket.
>
> The Court: Overruled."

This was the sole foundation laid by the prosecution for the admission of this highly prejudicial evidence. This was not an attempt to prove the falsity of a specific statement made by the defendant, or to show him unworthy of belief, but rather it was an attempt by the prosecution to do indirectly what it could not do directly. That is, prove the guilt of the defendant, using suppressed evidence, under the guise of impeaching LeMasters' general denial of guilt.

It is true that *Havens* may extend the scope of *Harris* and *Hass, supra,* to evidence elicited on cross-examination and that it indicates the exception may not require a specific statement to which the impeachment evidence is directed. It cannot, however, be said that any of these cases go so far as to permit "impeachment" of defend-

ant's plea of not guilty or his general denial of involvement in the crime. The entire purpose of the trial is to determine guilt, or expressed in a different way, to establish the falsity of the defendant's denial of involvement. It is for this reason that evidence tending to prove guilt, which has been previously suppressed, cannot be smuggled in under the guise of impeaching the defendant's denial of involvement in the crime or even, as the majority asserts, his general denial that he was at the place where the crime was committed on the day in question.

Even if the prosecution had sought to impeach LeMasters' testimony, concerning where he was on the day in question, *which it did not,* such evidence would in my view, of necessity, have been limited to evidence which would directly contradict his testimony that he had been at a particular place during a specific time period on the day in question.

Even the federal courts, in discussing this problem, have held that the nexus between defendant's specific testimonial assertions on direct or cross-examination, and the contradictory evidence introduced, must be extremely close. In *United States v. Mariani,* 539 F.2d 915 (2nd Cir.1976) the court held, *inter alia,* that:

> "The connection between Mariani's statement that he 'wouldn't rob a bank,' and the fact that bullets [previously suppressed] were found in his car, is far too tenuous to justify admission of this highly prejudicial evidence."

Since the majority, in the instant case, seems determined to abolish the exclusionary rule, it is my view that it should address the issues which led to its adoption, and by which its continuance has been justified, and should not attempt to accomplish its demise by expanding a narrow exception to the extent that the rule ceases to exist.

I would reverse.