**The PEOPLE of the State of Colorado, Petitioner,**

v.

**Troy J. COBB, Respondent.**

**No. 97SC410.**

Supreme Court of Colorado, En Banc.

July 6, 1998.

Rehearing Denied Aug. 10, 1998.

---

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Paul Farley, Deputy Attorney General, Roger G. Billotte, Assistant Attorney General, Criminal Enforcement Section, Denver, for Petitioner.

David F. Vela, Colorado State Public Defender, Ellen K. Eggleston, Deputy State Public Defender, Denver, for Respondent.

Justice SCOTT delivered the Opinion of the Court.

We granted the prosecution's request to review the judgment in *People v. Cobb*, No. 94CA1678 (Colo.App. March 6, 1997), where the court of appeals, in an unpublished opinion, reversed the defendant's conviction on one count of first degree sexual assault.[1] After reviewing the record, we conclude that the district court's exclusion of certain evidence as a sanction for failure to disclose the identity of a witness before trial was improper. We therefore affirm the judgment of the court of appeals and remand for a new trial.

I.

A.

This case arose from an incident that began on Colfax Avenue in Denver. The only

1. The question presented, as framed by petitioner, is:

Whether the trial court's exclusion of non-disclosed defense evidence must be affirmed where the record: (1) reasonably supports the trial court's finding of defense deceptiveness and ambush; (2) reasonably supports lack of a less drastic alternative; (3) reasonably establishes lack of material prejudice to the defense; or (4) establishes inadmissibility under the rape shield statute or CRE 404(b).

Respondent was also convicted of the lesser included offenses of soliciting prostitution and harassment, but in our order granting certiorari, we declined respondent's request to review the validity of his convictions on these counts.

witnesses to the crucial events in this case were Troy Cobb, the defendant, and T.B., the victim. In order to provide context for understanding the legal issues to be resolved, we are obliged to describe the competing versions of events offered by T.B. and Cobb.

T.B. testified as to the following circumstances and events. In August of 1993 she was working at a children's camp in Black Hawk. About 300 of the children at the camp planned to travel to Denver on August 14 for the World Youth Day Festival and papal visit, and on the day of the trip, T.B. decided to go along. The buses for the children were full, so she followed the group to Denver in her car. She said she had $15 with her.

T.B. said that when she arrived in Denver, she put $5 worth of gasoline in her car. She then parked the car on Sherman Street near the Capitol and met some of the children from the camp. After spending $10 on lunch at a fast food restaurant, T.B. testified, she had no money left. T.B. said she spent about four hours seeing the sites at the World Youth Day Festival, and at approximately 1:30 p.m., she decided to return to Black Hawk. However, T.B. said, when she returned to her car, she found it was out of gas. She said she thought the gas might have leaked or been siphoned.

T.B. said she began walking toward a friend's residence at 14th Avenue and Emerson Street to ask for help. She testified that although she grew up in southeast Denver, she was not familiar with central Denver and did not realize that 14th and Emerson is less than a ten-minute walk from the Capitol. T.B. said she started walking east on Colfax, occasionally putting her thumb out to try to catch a ride.

Cobb, who was driving down Colfax in his car, saw T.B. and pulled over. T.B. said Cobb asked if she wanted a ride, and T.B. got in the car. T.B. said she told Cobb about the problem with her car and he responded, "Oh, I thought you needed a date." T.B. testified that she said, "Do I look like I need a date? I need a ride." She said she thought his remark was amusing, because she was dressed in jeans and a t-shirt and looked "grubby." According to T.B., Cobb said, "Okay. Well, I'll give you a ride."

T.B. said Cobb asked if she was thirsty, and when she indicated that she was, he drove to a Safeway on 1st Avenue in Cherry Creek and bought some bottled water for her. Cobb told her he wanted to stop by a friend's house, but he drove to a parking garage under a deserted office building and parked the car with the passenger side next to a wall, blocking the passenger door so it could not be opened.

According to T.B., Cobb began making sexual advances, but she told him she was not interested and that she needed to get to her car. She said that Cobb became verbally abusive and violent, striking her twice and forcing her to perform fellatio on him. Thereafter, T.B. said, Cobb dressed and ordered her out of the car, threw her clothes out the window, and drove off. A passing motorist found T.B. in the street. T.B. was partially clothed and was crying.

Cobb's version of events differs substantially, but he conceded that he was looking for a prostitute when he saw T.B. walking down Colfax. Cobb said he concluded she was a prostitute based on the way she looked, smiled, and gestured for him to pull over to meet her.

Cobb said when he pulled over and opened the passenger door, T.B. negotiated and agreed to perform oral sex on him in return for $40, but she first insisted that they expose themselves to each other in order to ensure that Cobb was not a law enforcement officer. Cobb said she told him that if he wanted her to perform fellatio, she wanted some water to wash out her mouth, so he drove her to the grocery store and bought the bottled water.

Cobb said he drove to the garage and paid T.B. $40. He testified that T.B. removed her t-shirt and bra and began performing fellatio on him, but that the oral sex was unsatisfactory. He testified that he had her lay back on the seat so he could masturbate on her. Cobb said he was not angry, but merely frustrated because she hurt him with her teeth and used her arms to prevent him from ejaculating in her face as she had agreed to allow him to do.

Cobb said he took back $20 of the $40 he had given her and refused to drive her back to her car, forcing her out of his vehicle despite the fact that she was not fully dressed. He testified that as he was driving away, she said, "I'll get you, bald-headed motherfucker."

### B.

At trial, the defense sought to show that T.B. was familiar with the area where Cobb picked her up. This was a crucial issue, because her explanation of why she got into Cobb's car—that she was hitchhiking—would be significantly less credible if she knew that 14th and Emerson was only a few blocks from the location where she and Cobb met. The following exchange took place during the defense's cross examination of T.B.:

Q.: Have you run out of gas in any case?

A.: Yeah, sure I have. The Satellite and the van, I've run out of gas a few times.

Q.: On August 3—

A.: No.

Q.: Let me finish my question. August 5, nine days before this happened, did you run out of gas in any car?

A.: Not that I know of, huh-uh.

Q.: Are you sure?

A.: As far as I know I didn't. On August 5, remind me what day is that, that a weekday?

Q.: It would have been nine days before this, this was a Saturday, so I guess that would make it a Thursday?

A.: Run out of gas on a Thursday in the daytime?

Q.: Well, it would have been about 6:05 in the morning?

A.: No.

Q.: Are you sure?

A.: I'm sure. I wouldn't be up at 6:05.

During a break in the cross examination, the prosecution informed the court that it had just learned that a Denver police officer had been subpoenaed by the defense to appear at trial. The prosecution argued that the defense should not be allowed to call the officer as a witness because he was not endorsed by the defense prior to trial, so the defense was effectively "ambushing" the prosecution.

According to the prosecution, the officer had contacted T.B. nine days before the incident with Cobb. The officer found T.B. at 6:05 a.m. sitting with another man in a car parked in the 900 block of Colfax, close to the same location where Cobb picked her up on August 14 and only a few blocks from 14th and Emerson. The man who was sitting in the car with T.B. was arrested on an outstanding arrest warrant, and when the officer asked T.B. what she was doing sitting in a parked car, she said she had run out of gas.

Cobb's attorney advised the court that the prosecution had failed to disclose the existence of a contact card that would have revealed the prior incident in the parked car. Nonetheless, the defense had learned about the contact a few days before trial through independent investigation.

The prosecutors, however, said they did not know about the contact card. The trial court concluded that the defense's failure to reveal that it intended to call the officer constituted discovery abuse. As a sanction for this abuse, the trial court ruled that the defense could not call the officer as a witness nor could Cobb ask T.B. about the parked car episode. Hence, Cobb was precluded from introducing the officer's testimony in order to attack T.B.'s credibility. Cobb appealed to the court of appeals and we now review the judgment of the court of appeals ordering a new trial.

### II.

### A.

Rule Crim. P. 16(I)(a)(2) requires a prosecutor to disclose to the defendant "any material or information within his possession or control which tends to negate the guilt of the accused as to the offense charged or would reduce the punishment therefore." Rule 16(II)(c) provides that: "Subject to constitutional limitations, the trial court may require that the prosecuting attorney be informed of the nature of any defense which defense counsel intends to use at trial and the names and addresses of persons whom defense

counsel intends to call as witnesses in support thereof."

The court of appeals assumed, without deciding, that the name of the officer subpoenaed by the defense should have been disclosed prior to trial under Rule 16. On this record, we need not decide whether the officer should have been endorsed as a defense witness. We note, however, that arguably his testimony was offered only to rebut or impeach T.B.'s testimony, in which case the officer would not be a witness covered by Rule 16. *See People v. Muniz,* 622 P.2d 100, 102–103 (Colo.App.1980). Alternatively, even if endorsement was required, the defense's failure to disclose might have been excused by the prosecution's failure to produce the contact card that would have revealed the parked car episode to both the prosecution and the defense. *Cf.* Crim. P. 16(I)(b)(4) (imposing duty on prosecutor to ensure discovery of potentially exculpatory information in possession of police and other third parties). In any event, we need not reach this question, because we conclude that even if the defense violated Rule 16, the sanction imposed by the trial court in this case was excessive and therefore violated Cobb's right to challenge T.B.'s credibility through cross examination.

### B.

■ Although the trial court has broad discretion in deciding the appropriate course of action in response to a violation of Rule 16 by the defense, it must apply the standard articulated in *People v. Pronovost,* 773 P.2d 555 (Colo.1989). Specifically, the court must consider: (1) the reason for and degree of culpability associated with the violation; (2) the extent of resulting prejudice to the other party; (3) any events after the violation that mitigate such prejudice; (4) reasonable and less drastic alternatives to exclusion; and (5) any other relevant facts. *See Pronovost,* 773 P.2d at 558.

The prosecution learned of the surprise witness while it was still presenting its case in chief. As the court of appeals pointed out, the prosecution could have interviewed the officer and prepared for cross examination before he was called by the defense; a con-tinuance might not even have been necessary under the circumstances.

In addition, a number of reasonable and less drastic alternatives were available to the trial court, such as allowing the defense to question T.B. about the incident in the parked car. As we explain below, the defense was entitled to ask T.B. about the parked car without regard to whether the police officer who contacted her was available to testify about the incident. Moreover, the fact that the police officer's testimony concerned exculpatory information specifically requested by the defense but not provided by the prosecution was a relevant factor to be considered by the trial court.

■ The record does not reflect consideration by the trial court of the *Pronovost* factors. In light of this failure to apply the appropriate legal standard, particularly where the trial court rejected more limited alternatives to excluding the testimony outright, we hold that the trial court's ruling was in error and cannot stand.

■ As we have explained:

The purpose of the discovery process, including the imposition of sanctions, is to advance the search for the truth. When a party violates Rule 16, we believe the court should impose the least severe sanction that will ensure that there is full compliance with the court's discovery orders.

*People v. District Court,* 793 P.2d 163, 168 (Colo.1990). Of course, the trial court has broad discretion to weigh the factors enumerated in *Pronovost,* and bad faith is among the factors the trial court is entitled to consider. Nonetheless, exclusion is a drastic remedy and therefore is strongly disfavored, especially since in many cases it may well determine the outcome of the trial. *People v. District Court,* 793 P.2d 163, 168 (1990) (citing American Bar Association Standards for Criminal Justice).

■ While the need to protect the integrity of the discovery process is important, the need to find the truth is the paramount interest at stake in the criminal justice system. Other interests take precedence over truth-seeking only under the most compelling cir-

cumstances, and only to the extent minimally sufficient for their achievement. In this case, the trial court failed to apply the correct legal standard to whatever Rule 16 violation may have occurred, particularly with regard to the choice of remedy. Thus, the trial court's sanction cannot be upheld as a valid exercise of discretion under the circumstances.[2]

### C.

■■■ Having concluded that the trial court erred in its choice of sanction, we turn to an examination of the magnitude of the error in order to determine whether reversal of Cobb's conviction is necessary. We hold that the trial court's decision to prohibit the defense from questioning T.B. about the parked car incident violated Cobb's right under the Sixth Amendment to the United States Constitution to confront the witnesses against him and caused material prejudice to his defense. Consequently, the error was of constitutional dimension and a new trial is required unless it was harmless beyond a reasonable doubt.

■■■ The Sixth Amendment guarantees the right of the accused in a criminal case to confront adverse witnesses, so the right to cross examination is of constitutional significance. See Vega v. People, 893 P.2d 107, 118 (Colo.1995). A trial court has the authority to impose some limits on cross examination, but where the limits imposed prevent a criminal defendant from using cross examination to explore the bias or prejudice of a witness against him, the requirements of the Sixth Amendment are not met. See Merritt v. People, 842 P.2d 162, 166–68 (Colo.1992). In order to obtain a new trial, Cobb need not show that the limits on cross examination would have changed the outcome, but rather that the ruling preventing him from challenging T.B.'s credibility was not harmless beyond a reasonable doubt. See Arizona v. Fulminante, 499 U.S. 279, 312, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); see also Ble-

cha v. People, 962 P.2d 931, 936 (Colo.1998); Merritt, 842 P.2d at 168–69.

We have little trouble concluding that the trial court's decision to prevent the defense from asking T.B. about the previous incident on Colfax Avenue prevented a substantial challenge to T.B.'s credibility. Indeed, the effect of the sanction was to allow T.B.'s inaccurate testimony to go unchallenged. Cf. Merritt, 842 P.2d at 167–68. The trial court acknowledged that Cobb's efforts to impeach T.B. using the parked car incident were "important" to his defense. As we discussed in our recitation of the events at trial, the prosecution agreed that the police officer would testify that T.B. was at essentially the same location only nine days before the alleged assault and had then also claimed to have run out of gas. With the two main witnesses being the perpetrator and the victim, the significance of the victim's credibility to the outcome of the trial cannot be overstated. Therefore, where the defendant is not permitted to confront the main witness against him at trial, a new trial is required under Fulminante and Merritt.

### D.

■■■ The prosecution's remaining contention—that evidence relating to the parked car episode would have been inadmissible under CRE 404(b) or the rape shield statute—does not require much discussion here. Rule 404(b) limits the admissibility of evidence concerning conduct by a party or witness when such evidence is introduced to establish that the party or witness had a propensity to act in similar fashion on another occasion. See CRE 404(b). The rape shield statute is a more specific version of Rule 404(b), imposing procedural safeguards where a criminal defendant seeks to introduce evidence of the victim's prior sexual conduct. See § 18–3–407, 6 C.R.S. (1997). The prosecution argues that testimony or questions about the parked car incident would have been inadmissible in any event under Rule 404(b) because the defense want-

---

**2.** We also note that the trial court's refusal to allow the defense to ask T.B. about the parked car incident cannot be justified by reference to any discovery abuse. The defense would have been entitled to ask T.B. about the parked car even if it had been unable to locate the police officer because the defense had a good faith belief that the incident had occurred.

ed the jury to infer that T.B. was engaged in an act of prostitution when the police officer contacted her. For essentially the same reason, the prosecution says, testimony about the parked car would have been inadmissible because the defense failed to comply with the notice requirements of the rape shield statute. See § 18–3–407(2), 6 C.R.S. (1997) (establishing notice and hearing requirement for introduction of evidence of victim's prior sexual conduct in sexual assault trial).

■■■ The short answer to these arguments is that the evidence concerning the parked car incident does not show that T.B. was having a sexual encounter of any kind at the time she was contacted by the police officer. While the jury conceivably might have inferred that she was engaged in an act of prostitution, evidence does not become inadmissible under either Rule 404(b) or the rape shield statute simply because it might indirectly cause the finder of fact to make an inference concerning the victim's prior sexual conduct. Where evidence of a person's prior acts is probative for reasons other than its tendency to show the person's propensity to perform the same or similar acts at another time, the evidence is generally admissible. See People v. Madonna, 651 P.2d 378 (Colo. 1982); People v. Harris, 892 P.2d 378 (Colo. App.1994).

By the prosecution's own account, the proffered evidence of the parked car incident would have tended to show that T.B. was in the neighborhood only nine days before the alleged assault, at which time she claimed not to be familiar with the area. Moreover, the evidence would tend to cast doubt on T.B.'s representation to the effect that she ran out of gas on the day of the assault. As we have explained, this evidence was probative—in fact, it was quite important—with regard to the central factual issues before the finder of fact.

### III.

By way of summary, we are persuaded that the trial court failed to apply the correct legal standard in determining how to deal .with the defense's failure to disclose the identity of one of its witnesses before trial. In general, the outright exclusion of an undisclosed witness is to be avoided, if possible, particularly when a lesser sanction is available. Because the trial court's error was of constitutional dimension and we are not persuaded that it was harmless beyond a reasonable doubt, the judgment of the court of the appeals must be affirmed and hence the defendant's conviction must be reversed. Accordingly, we affirm the judgment of the court of appeals and return this case to it for remand for a new trial.

KOURLIS, J., dissents, and VOLLACK, C.J., and MULLARKEY, J., join in the dissent.

Justice KOURLIS dissenting:

In my view, the trial judge's decision to exclude certain evidence as a sanction for a discovery violation was within her discretion. Furthermore, if this evidence was offered solely to impeach T.B., it was of limited value in the context of all the other impeachment evidence. Thus, its exclusion would not constitute reversible error. I would therefore reverse the court of appeals' decision, and accordingly, I respectfully dissent.

### I.

The defendant was convicted of first degree sexual assault, a Class 3 felony, soliciting for prostitution, and harassment following a three day jury trial. The prosecution's evidence reflects that the defendant picked up the victim, T.B., while she was hitchhiking during the early afternoon of August 14, 1993 on Colfax Avenue. He took her to a secluded parking garage, struck her, forced her to perform oral sex, and then put her out of his car partially naked.

The defense asserted that T.B. was a prostitute who engaged in the charged acts on a consensual basis and who became angry with him because he refused to pay her the agreed-upon price for her services.

The charges were filed on August 18, 1993, and the case went to trial in May of 1994. On December 23, 1993, defense counsel filed a Disclosure to Prosecution Pursuant to Crim. P. 16(II), in which he identified the nature of his defense as General Denial and

Consent. He further noted that the witnesses whom he might call at trial in support of the defenses indicated were Paul Radovich, Walter Kraus, John Outlaw, and Ruth Barber, as well as any of the prosecution witnesses.

Trial began on May 25, 1994. On May 26, 1994, during a morning recess of the trial, the district attorney notified the court that she had just learned that the defendant had subpoenaed a police officer who was not identified in the discovery disclosures. The court and counsel addressed the issue outside the presence of the jury during the recess.

The record reflects that the police officer would have testified that he made contact with the victim, T.B., sitting in a man's car on August 5th at 901 E. Colfax, close to the intersection of Ninth Street and Emerson Street. The man was arrested for check fraud. The officer would further have testified that the victim told him that she had run out of gas. The contact between the officer and the victim was reflected on a police department contact card. In this context, a contact card is a record of a contact made between a police officer and someone who may have been suspected of prostitution. It is certainly arguable that the testimony and the contact card were intended to prompt the jury to reflect upon more than just the fact that the victim might have lied about having been at a particular location nine days prior to the charged incident.

Defense counsel argued that he intended to call the officer in order to impeach T.B.'s testimony, in particular her testimony during cross-examination that she was unfamiliar with the general area and with the specific intersection of Ninth and Emerson, and that she had not run out of gas on August 5th. He further argued that there was no duty

under Rule 16 to disclose impeachment witnesses or evidence.

The trial court found that the evidence was rebuttal evidence in support of defendant's general defenses; that defense counsel had known of the witness and the contact card for a period of time; that he had not disclosed the identity of the witness or the existence of the contact card to the prosecution or to the court; and that his motive for failing to disclose was trickery and deception.

The trial court precluded any testimony by the officer for two reasons: that defense counsel had, in bad faith, decided not to endorse the witness;[1] and, the name of the witness had not been announced to the jurors during voir dire in order to permit any jurors who had knowledge of that witness to be excused. The court also prevented defense counsel from questioning T.B. about the contact, because the factual basis for such questioning stemmed from the officer's excluded testimony.

The court of appeals assumed, without deciding, that the unendorsed witness should have been disclosed prior to trial under Crim. P. 16(II)(c). The majority opinion does not reach the question of whether defense counsel violated Rule 16 in its opinion.[2] However, I believe the trial court was correct in classifying the unendorsed witness' testimony as rebuttal evidence, which should have been disclosed by the defense prior to trial, thereby violating Rule 16.

## II.

Rule 16 provides at Part II(c): "Subject to constitutional limitations, the trial court may require that the prosecuting attorney be informed of the nature of any defense which defense counsel intends to use at trial and the names and addresses of persons whom defense counsel intends to call as witnesses in support thereof." Crim. P. 16(II)(c).

---

1. The trial court referred to the fact that defense counsel had "anticipated the impeachment in his opening statement." The record of the opening statement does not reflect a reference to the evidence. However, defense counsel admitted that he did bring it up in the course of voir dire. The record does not contain a transcription of voir dire, and therefore the exact comment made by defense counsel is not available to us.

2. The majority states that "the defense's failure to disclose might have been excused by the prosecution's failure to produce the contact card...." Maj. op. at 949. Of course, the trial court is free to consider all relevant factors in determining how best to remedy a discovery violation. *See People v. Pronovost*, 773 P.2d 555, 558 (Colo.1989). However, it is not appropriate for a party to defend against a discovery violation with a violation of its own.

The prosecution has even broader obligations to disclose witnesses and evidence to the defense under Rule 16. *See* Crim. P. 16(I). The intent of the Rule is to prevent trial by ambush: to permit counsel to be prepared, such that the jury can be presented with the evidence best calculated to lead to the truth. *See People v. Castro,* 854 P.2d 1262, 1264 (Colo.1993).

Here, the defense argues that the evidence at issue was impeachment evidence, and therefore the defense had no duty under Rule 16 to disclose it in advance. The trial court held that it was rebuttal evidence and subject to disclosure. There is indeed a distinction between impeachment evidence and rebuttal evidence, although that distinction is not outlined in Rule 16 itself, and the distinction is a slippery one.

The first precedent in Colorado is not precisely on point, but rather deals with the question in the context of an alibi defense. There, the court of appeals held that: "A distinction may be drawn between rebuttal testimony which refutes alibi evidence and impeachment testimony which does not contradict alibi evidence but does attack the credibility of defense witnesses on matters collateral to the alibi defense." *People v. Muniz,* 622 P.2d 100, 103 (Colo.App.1980).

In *People v. LeMasters,* 666 P.2d 573 (Colo.App.1983), a dissenting opinion of the court of appeals stated:

> Impeachment, in the evidentiary context, has been traditionally defined as the adducing of proof that a witness who has testified in a cause is unworthy of credit or belief. In this sense, impeachment evidence is limited to that which will directly and specifically disprove a witness' statements and such evidence has been almost exclusively limited to prior inconsistent statements.... All other evidence tending to disprove a witness' testimony is merely rebuttal evidence and must meet the same admissibility standards as any other evidence in the case.

*Id.* at 579 (citations omitted).

Black's Law Dictionary defines impeachment evidence as "proof that a witness is unworthy of belief" and defines rebuttal evidence as "evidence given to explain, repel, counteract, or disprove facts given in evidence by the adverse party." Black's Law Dictionary 753, 1267 (6th ed.1990). Extrapolating from *Muniz* and *LeMasters,* with the assistance of the legal definitions, impeachment evidence is evidence that goes to the credibility of a witness. Rebuttal evidence goes to the heart of the case, reflecting upon the truth of facts upon which the other side relies.

As much as the distinction is difficult to generalize, it is even more difficult to apply with specificity in the heat of a trial. In the case before the court, it is my view that the trial court was justified in concluding that the testimony of the officer and the contact card were appropriately classified as rebuttal evidence that should have been disclosed by the defense prior to trial. Although defense counsel argued that the evidence went merely to the question of whether the victim was familiar with the area around Ninth and Emerson, it had prejudicial implications far beyond that. As the majority opinion points out, the evidence would tend to cast doubt on the victim's representation to the effect that she ran out of gas on the day of the assault, and the jury could have conceivably inferred that she was engaged in an act of prostitution.

The testimony did not merely go to the victim's credibility on a collateral issue, but rather to the heart of the defense. This witness was not a casual bystander who could testify that he had happened to see T.B. at Ninth and Emerson the prior week, an intersection with which she had said she was not completely familiar. Such evidence would have very limited impeachment value and might even have been irrelevant. Rather, the witness was a police officer who would testify that he had made contact with the victim in the vehicle of another man, where she said she was sitting because she had run out of gas. The jury would have been invited to speculate about the nature of the contact and about whether it related to prostitution.

Hence, in my view, the evidence was rebuttal evidence related to defendant's defense and therefore subject to disclosure under Rule 16.

## III.

The next question is whether the trial court impermissibly excluded the evidence in

the face of the discovery violation. The majority concludes that the trial court failed to follow the standards of *People v. Pronovost,* 773 P.2d 555 (Colo.1989). I disagree.

A trial court possesses wide discretion in determining the proper sanction for discovery violations. *See Castro,* 854 P.2d at 1265; *Pronovost,* 773 P.2d at 558. The sanction must be "manifestly arbitrary, unreasonable, or unfair" in order to constitute an abuse of discretion. *See Nagy v. District Court,* 762 P.2d 158, 160–61 (Colo.1988).

The majority concludes that the trial court erred because the "record does not reflect consideration by the trial court of the *Pronovost* factors." Maj. op. at 949. I believe the record supports a finding in favor of the trial court's ruling on each of the *Pronovost* factors, regardless of whether the trial court engaged in a formal, step-by-step analysis of each factor. Second, and more importantly, the trial court specifically found that defendant engaged in the type of willful misconduct that can warrant exclusion of evidence, even when all the *Pronovost* factors are not satisfied. *See Taylor v. Illinois,* 484 U.S. 400, 415, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *People v. Richards,* 795 P.2d 1343, 1346 (Colo.App.1990).

In *Taylor,* the Supreme Court upheld the trial court's exclusion of witnesses that the defendant had failed to disclose in a timely fashion. *See Taylor,* 484 U.S. at 418, 108 S.Ct. 646. The Court stated:

> If [counsel's explanation for the discovery violation] reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony.

*Id.* at 415, 108 S.Ct. 646.

The court of appeals correctly acknowledged in *Richards* that although exclusion is

generally an inappropriate sanction, an exception exists in cases where defendant's conduct amounts to "sandbagging." *Richards,* 795 P.2d at 1346 (citing *Taylor* for the proposition that willful misconduct can justify exclusion).

None of the cases relied upon by the majority involve bad faith discovery violations. *See People v. District Court,* 793 P.2d 163, 168 (Colo.1990) ("The prosecutor did not willfully violate Rule 16, or otherwise act in bad faith."); *Pronovost,* 773 P.2d at 559 ("It is conceded that the defendant's failure ... was not willful or done in bad faith."); *see also Castro,* 854 P.2d at 1265 (noting that "disclosure was not made in the present case because Castro did not believe that there was any information to disclose"); *Richards,* 795 P.2d at 1346 (finding "no indications of conduct sufficient to invoke the *Taylor* exception"); *People v. Reger,* 731 P.2d 752, 756 (Colo.App.1986) (noting that defendant "did not show any good cause excusing failure to comply" with discovery rules, but not finding bad faith or willful misconduct).[3]

When the trial court finds that counsel has acted in bad faith,[4] the range of permissible sanctions broadens. *See Taylor,* 484 U.S. at 416–17, 108 S.Ct. 646 ("[T]he inference that [defendant] was deliberately seeking a tactical advantage is inescapable. Regardless of whether prejudice to the prosecution could have been avoided in this particular case, it is plain that the case fits into the category of willful misconduct in which the severest sanction is appropriate.").

Additionally, as noted above, even proceeding through the remaining *Pronovost* factors, there is ample support for the trial judge's ruling. The prosecutor was quite obviously surprised by the proffered evidence. In their brief before this court, the People point out that another individual was also present at the time of the officer's contact with the

---

3. In *Reger,* cited by the court of appeals, the court of appeals found that the trial court did not abuse its discretion in precluding defendant's impaired mental condition defense, even though the lesser sanction of a continuance might have remedied the harm.

4. During argument on the point outside the presence of the jury, the trial judge stated to defense counsel "[Y]ou deceived the Court, you deceived the prosecution.... It is clear to me ... that your motive for handling the situation this way was deception."

victim. The prosecutor could hardly be expected to locate and investigate this individual in the middle of trial in order to effectively respond to the proposed testimony. Further, no events occurred subsequent to the violation that might mitigate this prejudice. Finally, in my view, a less drastic alternative was not required.

The record also reflects the trial judge's concern that this witness' name had not been read to the jury during voir dire. There had been no opportunity to discover whether any of the jurors knew the witness, thereby increasing the possibility of taint and a subsequent mistrial. For this additional reason, it is rarely proper to allow a surprise witness.

### IV.

Finally, I cannot possibly conclude that the omission of this particular impeachment evidence constituted reversible error. Defense counsel contends, and the majority's reasoning relies upon, the fact that the evidence was to be offered solely for the purpose of impeaching T.B.

T.B.'s original testimony regarding her knowledge of the area at Ninth and Emerson was uncertain and equivocal. Countering her testimony with the assertion that she had been in the area before would hardly reveal a glaring fabrication. The testimony that she had run out of gas before on a particular day would have been more pointedly refuted. This too, however, still only goes to a minor, collateral issue.

Most importantly, defense counsel in fact impeached T.B. numerous times with prior inconsistent statements made to investigators and with her testimony at the preliminary and motions hearings. Thus, the additional impeachment evidence, of limited value on its own, becomes particularly insignificant because it only represented a minimal part of the total opportunities to attack T.B.'s credibility.

If, on the other hand, defense counsel's true purpose for introducing this evidence was to suggest to the jury that T.B. had engaged in prostitution in the past and thus had consented to the contact, this type of evidence was likely inadmissible under the rape shield statute. *See* § 18–3–407, 6 C.R.S. (1997). Accordingly, in this circumstance, even if defense counsel had properly endorsed the witness, the testimony still would have been inadmissible.

### V.

I agree with the majority that truth-seeking is of paramount importance to our criminal justice system. I also note, however, that the discovery process and full disclosure are designed to protect the search for truth by preventing "trial by ambush." In this case, the trial court was well within its discretion in ordering preclusion of the witness after a finding of bad faith.

I am authorized to state that VOLLACK, C.J., and MULLARKEY, J., join in this dissent.

