Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
December 11, 2023

**2023 CO 61**

**No. 23SA111, *In re People v. Tippet*—Discovery Prior to and Incident to Trial—Failure to Disclose; Sanctions—Power of Courts to Issue Particular Sanctions.**

In this original proceeding, the supreme court addresses whether the district court abused its discretion by reducing the charge against Joseph James Tippet from first degree murder to second degree murder as a sanction for the Eleventh Judicial District Attorney's Office's discovery violations. The court concludes that, while this type of sanction is a disfavored remedy reserved for rare cases, the district court did not abuse its discretion by reducing Tippet's charge as a deterrent sanction given the District Attorney's Office's two-year long pattern and practice of neglect of its discovery obligations that persisted, notwithstanding repeated admonitions by multiple judicial officers in the Eleventh Judicial District, and the imposition of many and varied sanctions against the office in numerous documented cases. The court, accordingly, discharges the rule to show cause.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

---

### 2023 CO 61

---

**Supreme Court Case No. 23SA111**
*Original Proceeding Pursuant to C.A.R. 21*
Fremont County District Court Case No. 23CR5000
Honorable Kaitlin B. Turner, Judge

---

**In Re**
**Plaintiff:**

The People of the State of Colorado,

v.

**Defendant:**

Joseph James Tippet.

---

**Rule Discharged**
*en banc*
December 11, 2023

---

**Attorneys for Plaintiff:**
Linda Stanley, District Attorney, Eleventh Judicial District
Mark Hurlbert, Deputy District Attorney
   *Cañon City, Colorado*

**Attorneys for Defendant:**
Megan A. Ring, Public Defender
Adam Robert Tunink, Deputy Public Defender
   *Salida, Colorado*

**Attorneys for Respondent Fremont County District Court:**
Shannon Stevenson, Solicitor General

Joseph A. Peters, Senior Assistant Attorney General
Joseph G. Michaels, Assistant Solicitor General
Allison S. Block, Assistant Attorney General Fellow
        *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado District Attorneys' Council:**
Kevin E. McReynolds, Senior Appellate Deputy District Attorney
        *Golden, Colorado*

Arnold J. Hanuman
        *Denver, Colorado*

**Attorneys for Amicus Curiae Office of the Colorado Attorney General:**
Natalie Hanlon Leh, Chief Deputy Attorney General
Jillian J. Price, Deputy Attorney General
        *Denver, Colorado*

**JUSTICE BERKENKOTTER** delivered the Opinion of the Court, in which
**JUSTICE HOOD, JUSTICE GABRIEL**, and **JUSTICE HART** joined.
**JUSTICE SAMOUR**, joined by **CHIEF JUSTICE BOATRIGHT** and **JUSTICE
MÁRQUEZ,** dissented.

JUSTICE BERKENKOTTER delivered the Opinion of the Court.

¶1     In this original proceeding, we consider whether the district court abused its discretion by (1) granting Joseph James Tippet's motion seeking discovery sanctions against the Eleventh Judicial District Attorney's Office based on a pattern of neglect, and (2) reducing the charge against Tippet from first degree murder to second degree murder.[1] We granted the People's petition to review that order by issuing a rule to show cause.  We conclude that the district court did not abuse its discretion by determining that the District Attorney's Office engaged in an ongoing, significant pattern of discovery violations across multiple cases, or, in light of the specific circumstances of this case, by reducing the charge against Tippet as a deterrent sanction.

¶2     Accordingly, we discharge the rule to show cause.

## I.  Facts and Procedural History

¶3     The People allege that, on January 6, 2023, Tippet shot and killed his father. Tippet was taken into custody that evening and ultimately charged with first degree murder.  § 18-3-102(1)(A), C.R.S. (2023).

---

[1] The People's petition presents the following issue:

> 1.  As a remedy for late discovery, does a trial court have authority to lower the charges after discovery has been provided and prior to scheduling of the preliminary hearing?

3

¶4     At his first appearance on January 18, the parties discussed defense motions D-9 and D-10.  In motion D-9, Tippet asked the magistrate to order the prosecution to comply with Rule 16 of the Colorado Rules of Criminal Procedure, which requires it to make certain material and information in its possession or control available "as soon as practicable" but not later than twenty-one days after a defendant's first appearance.  Crim. P. 16(I)(b)(1).  Tippet also sought, in motion D-10, an order requiring the memorialization and disclosure of all law enforcement conversations with potential victims and witnesses.  Defense counsel noted that while Rule 16 was self-executing and the People's obligation was to produce information as soon as practicable, he was concerned because he had yet to receive any discovery from the People.  His concerns were greatly exacerbated, he added, given what he described as a pattern of discovery violations by the District Attorney's Office in other recent cases.

¶5     The prosecutor assigned to the case did not appear, but the deputy covering for her assured the court that the People understood their discovery obligations.

¶6     The magistrate granted motion D-9, subject to an exception for privileged communications.  The magistrate also granted motion D-10, ordering:

> Not later than January 28, 2023,[2] the prosecution shall discover to the Defense all materials and information within its possession or control

[2] While the magistrate set the Rule 16 discovery deadline for January 28, 2023, the deadline for Rule 16(I)(a)(1) disclosures, falling twenty-one days from the

4

as to items defined in Colorado Rules of Criminal Procedure, Rule 16, Part I, (a) (1) (I), (IV), (VII) and (VIII). The term possession or control includes those defined items that are in the possession of the investigating agencies[,] and it is the responsibility of the prosecution to discover those items in the possession of the agencies regardless of whether the prosecution maintains those items in its actual possession. . . .

The prosecution shall instruct the investigating officers to retain and turn over to the prosecution all notes of interviews with witnesses for discovery to the Defense.

The magistrate set the matter over to March 8 for a pretrial conference.

¶7 Forty-seven days later, on March 6—vexed about the state of discovery in the case—Tippet filed a motion to dismiss the first degree murder charge as a sanction for the prosecution's violation of the magistrate's orders. Tippet argued that the prosecution had only produced 148 pages of discovery and some body-worn camera footage by the discovery deadline. He acknowledged that the prosecution produced twenty-eight additional pages of discovery after the deadline, but in his view, this production only proved that the prosecution continued to fall down on its Rule 16 obligations. All the late-discovered materials, Tippet asserted, including his interrogation and the autopsy report, were created before the discovery deadline, and therefore should have been turned over by that date.

_____

"defendant's first appearance at the time of or following the filing of charges" fell on February 8, 2023. Crim. P. 16(I)(b)(1). We use February 8, 2023, to calculate periods of delay throughout this opinion.

¶8 Tippet contended that these violations were part of an ongoing pattern and practice by the District Attorney's Office of neglecting its discovery obligations. To illustrate his point, the motion identified nearly thirty other cases in which the District Attorney's Office faced pattern discovery sanctions by various judges sitting in the Eleventh Judicial District during the preceding two years.

¶9 Tippet argued that, without the requisite discovery, his attorney was unable to investigate the first degree murder charge or prepare to cross-examine Tippet's accusers. In short, Tippet—who remained in custody—asserted he was being denied his right to effective assistance of counsel. Only a significant deterrent sanction, like reducing his charge to second degree murder, would suffice, he urged, because the discovery violations in his case, along with the District Attorney's Office's ongoing pattern of neglect of its discovery obligations, demonstrated a need for the Office to modify its discovery practices.

¶10 The next day, March 7, Tippet filed another motion to dismiss the first degree murder charge, this time identifying additional discovery violations. The prosecution, he asserted, still had not produced: (1) 911 call recordings; (2) computer-aided dispatch event reports ("CAD reports") and notes from the various investigating law enforcement agencies, including the Fremont County Sheriff's Office, the Cañon City Police Department, the Colorado State Patrol, the Salida Police Department, and the Chaffee County Sheriff's Office; and (3) two

hours of video footage alleging to show Tippet at his prior employer before the alleged offense.

¶11 The parties were set to appear before the magistrate the next day, March 8, for a pretrial conference. At first, the People failed to appear. Midway through, a third deputy district attorney, Deputy Little, appeared by WebEx, and explained that a fourth deputy was now responsible for the case but that she was in training that day and would not appear.

¶12 During the pretrial conference, the parties discussed the status of the prosecution's discovery and Tippet's motions to dismiss. Deputy Little made no representations about his office's compliance with the court's discovery orders. The magistrate advised the parties that "since the Defense [was] seeking dismissal as a sanction, [his] inclination [wa]s to refer this to the District Court for a ruling on that," though he indicated he wasn't going to set anything at that time.

¶13 The parties next appeared before the magistrate on March 22, forty-two days after the Rule 16(I)(b)(1) disclosure deadline. Discovery issues again dominated the hearing. Defense counsel represented that he had only received 190 pages of discovery as of that date, far less than he would expect in a first degree murder case. And he asserted that the ongoing discovery issues were making it impossible for him to effectively represent Tippet and to prepare for his preliminary hearing.

¶14 Deputy Little appeared for the People. He countered that discovery did not have to be completed prior to a preliminary hearing and that the prosecution had been responsive, stressing that "[a]nytime somebody says, this is what's lacking, we go and get it." And, in any event, he observed, regardless of any late discovery, the preliminary hearing's outcome was essentially a foregone conclusion because the People had discovered Tippet's recorded confessions.

¶15 The magistrate was unmoved by the prosecution's arguments. He explicitly reminded the prosecution (1) that its belief about the timing of discovery was erroneous, (2) that discovery under Rule 16(I)(a)(1) was due within twenty-one days of Tippet's first appearance, and (3) "we are far beyond that" deadline. The magistrate set the matter over for seven days—until March 29—and explained that if the People had not turned over all the discovery required under the rule by then, he would set the matter for a sanctions hearing with District Court Judge Turner. The magistrate also admonished the People: "[Y]ou have to do your job. You simply have to do it. *And there is a pattern of this office not doing it.*" (Emphasis added.) The magistrate warned that he would not continue to hold hearings on discovery violations "over and over and over again," merely to have the People say, "[w]ell, we're doing the best we can."

¶16 Six days later, on March 28—forty-eight days after the Rule 16(I)(b)(1) disclosure cutoff—the People produced 1,134 additional pages of discovery and

8

filed a document certifying that they had disclosed all discovery in their possession and in the possession of the investigating law enforcement agencies.

¶17 Tippet responded by supplementing his motions to dismiss and raising new concerns regarding the People's compliance with their Rule 16(I)(a)(1) discovery obligations. Tippet asserted that the People's most recent production proved exactly what he had been arguing since his first appearance on January 18: that the People would not, and did not, comply with their discovery obligations. Specifically, he noted that the prosecution's production of 1,134 additional pages of discovery in the *preceding six days* represented 85% of the total discovery produced since the case began.

¶18 And, Tippet continued, the prosecution's certification of compliance with its discovery obligations was inaccurate because the violations were ongoing. It still, Tippet asserted, had not produced certain types of communication, including police notes from the investigating law enforcement agencies and email and text correspondence between the prosecution and those agencies, which the magistrate directed the People to produce in his order granting defense motion D-9 back in January.

¶19 The next day, during yet another hearing to discuss the status of the case and discovery issues, the magistrate asked the People whether the late discovery disclosures represented a systemic problem with the District Attorney's discovery

procedures. Deputy Little, who again appeared for the People, responded that he couldn't "comment on that," answering only that it was "an issue that really needs to be resolved." Then, after acknowledging Tippet's pending sanctions motions, Deputy Little indicated that he needed an opportunity to file a response to the motions and that he thought that the motions for sanctions and the question of whether there was a systemic problem with the District Attorney's discovery process, "would be more necessarily opined or discussed in front of Judge Turner if she were inclined to impose sanctions."

¶20 The magistrate then set the sanctions motions to be heard by the district court on March 31.

¶21 On March 30, the People filed a response to the motions for sanctions, asserting that the discovery violations in Tippet's case were due to support staff's "mistaken assumptions" and failures to verify that all discovery had been obtained through their internal discovery software. Similarly, the People answered that "human error, technological glitches, or agency partnership disconnects or miscommunications" were the basis for many of the discovery violations in the almost thirty cases cited in Tippet's first motion for sanctions. The prosecution did not contend that the magistrate's previous orders mooted Tippet's sanctions motions or rendered consideration of the motions or the imposition of sanctions unjust or unfair.

¶22 The next day, at the March 31 sanctions hearing before the district court, the defense reiterated that the prosecution was still in violation of the court's order granting defense motion D-9. Appearing for the People, Deputy Little indicated that the office was beginning to overhaul its discovery system, and that it was the support staff who caused the discovery "delays." Staff, he asserted, mistakenly believed that the office had received all the discovery from the investigating law enforcement agencies. It had not, he admitted. As a result, no recordings, CAD reports, or notes were requested from the four law enforcement agencies that assisted the Fremont County Sheriff's Department with the investigation into the victim's death until between March 22 and March 28.

¶23 Notably, the prosecution did not contend that the magistrate's previous orders mooted Tippet's sanctions motions or rendered consideration of the motions or the imposition of sanctions unjust or unfair.

¶24 The court granted Tippet's motions requesting sanctions. In its order, the court reviewed the People's explanations for the discovery violations in this case and found that they boiled down to "three primary problems":

> One, the District Attorney has changed the assigned prosecutor several times. Two, by failing to verify discovery was properly downloaded and disclosed, the District Attorney's staff either acted negligently or lack adequate training with respect to the District Attorney's obligation to disclose evidence timely to the defense. Third, the District Attorney has failed to communicate adequately with investigating law enforcement agencies to secure evidence promptly.

11

(Internal citations omitted.)

¶25 The court continued: "None of these problems is new. The District Attorney has cited its problems with mistakes made by staff that have since left the District Attorney's employ in numerous cases since 2021."

¶26 The court also considered twenty of the thirty cases Tippet identified as indicative of the District Attorney's "pattern and practice of neglect" of its discovery obligations. The court agreed such a pattern existed, and that it persisted despite the imposition of many and varied sanctions against the District Attorney's Office across multiple cases and even despite specific warnings about the apparent lack of oversight and supervision in the District Attorney's discovery process. These cases, the court concluded, "reveal[ed] an urgent and serious need for the District Attorney to modify its discovery practices."

¶27 Based on these circumstances, the court determined that the least severe sanction it could impose to deter continuing Rule 16 violations, while also preserving the truth-seeking function of discovery, was to reduce the charge against Tippet from first degree murder to second degree murder. The court additionally directed the People to file an amended complaint consistent with the court's order.

¶28 The People then filed a petition invoking our original jurisdiction under C.A.R. 21. We issued a rule to show cause.

## II. Analysis

¶29    We begin by discussing our jurisdiction to hear this matter pursuant to C.A.R. 21. Next, we detail the relevant standard of review and principles of law governing criminal defendants' discovery rights before trial and the power of courts to issue sanctions for violations of those rights. We then apply these principles to the matter before us, and conclude that under these specific facts, the district court did not abuse its discretion when it sanctioned the People for their ongoing pattern discovery violations by reducing the charge against Tippet from first degree murder to second degree murder.

## A. Original Jurisdiction

¶30    It is entirely within this court's discretion to exercise original jurisdiction pursuant to C.A.R. 21. *See* C.A.R. 21(a)(1) ("Relief under this rule . . . is a matter wholly within the discretion of the supreme court."); *People v. Hernandez*, 2021 CO 45, ¶ 13, 488 P.3d 1055, 1060. Specifically, "we have original jurisdiction to review whether a trial court has abused its discretion in circumstances where the remedy on appeal would be inadequate." *Hoffman v. Brookfield Republic, Inc.*, 87 P.3d 858, 861 (Colo. 2004). While challenges to discovery orders are traditionally reviewed on appeal, it can nevertheless be appropriate to review such orders "interlocutorily, by way of original proceeding, where the impact of the ruling

13

would be substantial and incurable at a later time." *People v. Lee*, 18 P.3d 192, 196 (Colo. 2001).

¶31 The People argue that the exercise of original jurisdiction is appropriate in this case because whether a trial court may reduce a defendant's charges as a discovery sanction presents an issue of first impression. They further contend that the issue is one of public importance. *See, e.g.*, *Dwyer v. State*, 2015 CO 58, ¶ 4, 357 P.3d 185, 187–88 (noting that this court "generally elect[s] to hear C.A.R. 21 cases that raise issues of first impression and that are of significant public importance" (quoting *In re Marriage of Wiggins*, 2012 CO 44, ¶ 12, 279 P.3d 1, 5)). We agree.

¶32 First, this court has never considered whether a trial court can reduce a defendant's charge as a deterrent discovery sanction. Second, reducing Tippet's charge could have a significant effect on the "prosecution's ability to litigate the merits of the case." *Lee*, 18 P.3d at 196. Accordingly, we conclude that our exercise of jurisdiction over this case pursuant to C.A.R. 21 is warranted.

## B. Legal Framework and Standard of Review

¶33 Crim. P. 16(I)(a)(1) provides that "[t]he prosecuting attorney shall make available to the defense . . . material and information which is within the[ir] possession or control . . . concerning the pending case . . . ." This rule requires that such information be produced "as soon as practicable but not later than 21 days

14

after the defendant's first appearance at the time of or following the filing of charges." Crim. P. 16(I)(b)(1). Importantly, this duty does not depend on the defendant having to first request the information. *See People v. Dist. Ct.*, 790 P.2d 332, 337 (Colo. 1990) ("Crim. P. 16 as amended requires automatic disclosure of the enumerated items regardless of whether the defense requests them."). Rather, the self-executing nature of Rule 16 imposes a responsibility on the prosecutor to "ensure that a flow of information is maintained between the various investigative personnel and his or her office sufficient to place within his or her possession or control all material and information relevant to the accused and the offense charged." Crim. P. 16(I)(b)(4); *see also People v. Adams Cnty. Ct.*, 767 P.2d 802, 804 (Colo. App. 1988) ("The policy reason for the change in Crim. P. 16 is to provide for open file disclosure of such materials . . . .").

¶34     In the event of a discovery violation, Rule 16(III)(g) provides that the trial court "may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, prohibit the party from introducing in evidence the material not disclosed or *enter such other order as it deems just under the circumstances*." (Emphasis added.) Choosing an appropriate sanction for discovery violations lies within the sound discretion of the trial court and will not be overturned absent an abuse of discretion. *People v. Daley*, 97 P.3d 295, 298 (Colo. App. 2004). This deferential standard of review applies because of "the

multiplicity of considerations involved and the uniqueness of each case." *Lee*, 18 P.3d at 196.

¶35 That said, the trial court's discretion in imposing a sanction for a discovery violation is not unlimited. *Id.* We will reverse a trial court's imposition of discovery sanctions when they are "manifestly arbitrary, unreasonable, or unfair." *People v. Castro*, 854 P.2d 1262, 1265 (Colo. 1993) (quoting *Nagy v. Dist. Ct.*, 762 P.2d 158, 161 (Colo. 1988)). In imposing discovery sanctions, the trial court must exercise its discretion "with due regard for the purposes of the discovery rules themselves and the manner in which those purposes can be furthered by discovery sanctions." *Lee*, 18 P.3d at 196.

¶36 We have previously explained that the purpose of the discovery process laid out in Rule 16 "is to advance the search for truth." *People v. Dist. Ct.*, 793 P.2d 163, 168 (Colo. 1990). Sanctions for violating Rule 16 likewise serve the dual purposes of "protecting the integrity of the truth-finding process and deterring discovery-related misconduct." *Lee*, 18 P.3d at 196. Though without "willful misconduct or a pattern of neglect demonstrating a need for modification of a party's discovery practices, the rationale for a deterrent sanction loses much of its force." *Id.* When a deterrent sanction is inappropriate, "the goal must be to cure any prejudice resulting from the violation." *Id.* at 197.

16

¶37 To address a Rule 16 violation, the trial court must strike a balance by "impos[ing] the least severe sanction that will ensure that there is full compliance with the court's discovery orders." *Dist. Ct.*, 793 P.2d at 168. We have laid out several factors that a court must consider when fashioning discovery sanctions: "(1) the reason for and degree of culpability associated with the violation; (2) the extent of resulting prejudice to the other party; (3) any events after the violation that mitigate such prejudice; (4) reasonable and less drastic alternatives to exclusion; and (5) any other relevant facts." *People v. Cobb*, 962 P.2d 944, 949 (Colo. 1998). We most recently applied this framework in *Lee*, where the trial court excluded DNA evidence as a discovery sanction. 18 P.3d at 194. We ultimately concluded that the trial court's sanction constituted an abuse of discretion, reasoning that the record indicated that (1) the prosecutor's violation of Rule 16 was not willful, (2) there was no need to deter future violations, (3) exclusion would not cure any prejudice, and (4) a continuance could have been adequate to cure any prejudice. *Id.* at 196–98.

¶38 While instructive, *Lee* and most of our other discovery sanction cases have not involved challenges to deterrent sanctions imposed for willful misconduct or pattern discovery violations. *See Cobb*, 962 P.2d at 949–50 (concluding that the trial court abused its discretion by excluding a witness from testifying where the defense failed to disclose a single witness before trial); *Dist. Ct.*, 793 P.2d at 169

17

(concluding that the trial court's discovery sanction was "not merited by the possible deterrence of prosecutorial misconduct").

¶39     Even so, we have long recognized in deterrent sanction cases that "the exclusion of evidence or even complete dismissal can be proper remedies to assure compliance with discovery orders." *Lee*, 18 P.3d at 196; *see, e.g.*, *People v. Thurman*, 787 P.2d 646, 655 (Colo. 1990) (holding the trial court did not abuse its discretion by dismissing criminal charges pursuant to Crim. P. 16(III)(g) in response to the prosecution's willful and continuing refusal to disclose a confidential informant's address and place of employment notwithstanding a court order to do so); *People v. Dist. Ct.*, 664 P.2d 247, 252 (Colo. 1983) (approving the trial court's sanction excluding fingerprint evidence implicating the defendant where the district attorney failed to comply with a specific discovery order or obtain the defendant's fingerprints for nearly nine months, causing a mistrial).  Indeed, when a trial court imposes a discovery sanction to deter future misconduct, the goal is to impose a sanction that sufficiently encourages a "modification of a party's discovery practices."  *Daley*, 97 P.3d at 298–299 (holding that "[t]here was no showing of a . . . need for deterrence, and therefore, the trial court should have considered only curative sanctions").

¶40     With these legal principles in mind, we now apply the law to the facts of this case.

18

## C. The District Court Did Not Abuse Its Discretion

¶41 The People do not dispute that they committed multiple discovery violations in this case. Rather, they contend that (1) the district court erred by finding that the prosecution engaged in a pattern of neglect, (2) they did not have notice of the claim that a pattern of discovery violations existed, (3) the district court's sanction was too harsh for discovery violations that were not willful, (4) the district court's choice of sanction was not proper because Tippet was not prejudiced by the discovery violations, (5) the district court's sanction was an abuse of discretion, and (6) the district court lacked the authority to reduce Tippet's charge.

### 1. A Pattern of Discovery Violations Existed

¶42 We first address the People's contention that the district court erred by finding that the District Attorney's Office engaged in a pattern of discovery violations.

¶43 In its order, the court examined twenty of the almost thirty cases Tippet identified as evidence of the District Attorney's Office's ongoing pattern of Rule 16 discovery violations. These included cases dating back to July 2021 and continuing up to the date of the sanctions hearing in which various judges sitting in the Eleventh Judicial District made explicit findings about the District Attorney's Office's serious and ongoing lack of compliance with its discovery

19

obligations. The twenty cases illustrate, among other things, multiple significant discovery violations by the District Attorney's Office; explicit warnings from various judges that a pattern of neglect was emerging or had emerged; a lack of understanding by prosecutors regarding their Rule 16 obligations; an apparent lack of oversight by the District Attorney in the face of significant continuing discovery problems; and a pattern by the District Attorney's Office of dismissing cases when faced with discovery sanctions.

¶44 These cases also demonstrate that beginning in July 2021, five different judicial officers sitting in the Eleventh Judicial District entered orders finding that the District Attorney's Office had engaged in a pattern of discovery violations, and imposed deterrent sanctions including bond reductions, exclusion of late-disclosed evidence, exclusion of expert witness testimony, and ultimately, reduction in charges. A small sample of these orders includes:

- In July 2021, a judge in a vehicular eluding case cautioned that a pattern of discovery violations was starting to form and warned that the court would impose sanctions if the pattern continued.

- A few months later, a judge in a homicide case found that "[i]t is clear to this Court there is a pattern of discovery violations in this case attributable to the People. . . . These violations continue and are ongoing . . . ." The court ultimately excluded ten of the prosecution's endorsed expert witnesses from testifying. Following the court's order, the prosecution moved to dismiss the case.

- In September 2021, a judge presiding over a homicide case found that the District Attorney's Office had engaged in a pattern of discovery

20

violations and that the discovery violations amounted to gross negligence. The court sanctioned the prosecution by excluding the testimony of one expert witness, reducing the defendant's charge from a class 1 felony to a class 2 felony, and granting a continuance. The court subsequently excluded additional late-disclosed evidence based on the prosecution's additional failure to comply with Rule 16.

- Several months later, in a case involving allegations of sexual exploitation of a child, a judge found that "there is an apparent lack of oversight and supervision in the discovery process within the Office of the District Attorney." The court then warned that the "lack of oversight comes dangerously close to a pattern of neglect that may well result in a finding of a pattern of discovery [violations] in the future if it continues." When the defense filed a second motion alleging additional discovery violations, the prosecution moved to dismiss all charges.

- Just a week later, a judge presiding over a sexual assault case questioned the prosecution about why discovery violations kept happening "over and over and over again," and raised concerns that "this is a managerial problem and nobody's looking at this stuff until the last minute." The prosecutor, who was covering for the assigned prosecutor that day, responded, "When I do a request, I assume that the law enforcement agency is sending it over." The court instructed the prosecutor, "[Y]ou can't assume." After finding that the defendant was prejudiced by the late disclosures, the court sanctioned the prosecution and reduced the defendant's bond to a $10,000 personal recognizance bond.

- In a case involving alleged sexual assault, the judge presiding over the case found that the prosecution violated Rule 16 and had engaged in a pattern of Rule 16 violations that prejudiced the defendant. The court sanctioned the prosecution by reducing the defendant's $5,000 cash only bond to a $5,000 personal recognizance bond.

- In a case involving allegations of sexual assault committed against children, the judge presiding over the case found that the prosecution had violated Rule 16, that the defendant suffered prejudice, and that the District Attorney's Office had engaged in a pattern of Rule 16 violations.

The court sanctioned the prosecution by ordering the reduction of the top charges in the case from class 3 felonies to class 4 felonies.

¶45 These cases illustrate a pattern of ongoing and significant discovery violations that persisted over a lengthy period of time despite the imposition by various judges of many and varied sanctions against the District Attorney's Office. These violations continued in Tippet's case due to a long-established pattern in which the District Attorney's Office failed to exercise adequate oversight and supervision over its discovery process. In light of these circumstances, we cannot conclude that the district court abused its discretion by determining that the District Attorney's Office engaged in a pattern of Rule 16 discovery violations.

## 2. The People Had Notice of Their "Pattern of Discovery Violations"

¶46 Next, the People contend that they were not given an adequate opportunity to argue that the other cases represented isolated events with "no logical connection." We are not persuaded.

¶47 The District Attorney's Office had notice and an opportunity to litigate whether the discovery violations in each of the twenty cases considered by the district court supported finding a pattern of neglect. First, it received notice on March 6, when Tippet moved for discovery sanctions and identified each of those cases as illustrative of the Office's pattern of neglect. Indeed, not only did the

People have notice, but they filed a motion responding to this motion for sanctions, arguing that the other cases were too dissimilar to establish a pattern.

¶48 Second, the record shows that the district court explicitly gave the People an opportunity to litigate this point. At the beginning of the sanctions hearing, the court said, "[B]efore we get into the specific nature of the sanctions, the Defense is arguing a pattern. Do you want to be heard on that?" The prosecution argued that the cases did not establish a pattern, but the court rejected its argument. Thus, we disagree with the District Attorney's Office that it was not afforded an adequate opportunity to respond to Tippet's assertion that the cited cases reflected a pattern of discovery violations.

¶49 The People next assert that they don't know what a "pattern" means in the context of discovery violations, and that the district court should have held a separate hearing, apart from the sanctions hearing, to define what "pattern" means. They contend that, because "pattern of discovery violations" has not been defined by the appellate courts, it has "no objective meaning associated with it." The People further ask that we adopt their definition of "pattern of discovery violations," and limit the imposition of deterrent sanctions to those cases which involve (1) the same prosecuting attorney; (2) the same type of discovery violation; (3) an office policy of withholding evidence; and/or (4) actions in combination that

are so egregious and reflect a "repeated sloppiness" that rise to the level of withholding evidence.

¶50     We decline to adopt this definition for two reasons. First, the term "pattern" already has a generally understood meaning. *See Pattern*, Black's Law Dictionary (11th ed. 2019) (defining pattern as a "mode of behavior or series of acts that are recognizably consistent"). Second, their proposed definition significantly misstates the District Attorney's Office's obligations under Rule 16. To be sure, individual prosecutors are bound by Rule 16, but the People's proposed definition disregards the responsibility an elected district attorney has to oversee and supervise the office's discovery process. The exceptionally narrow definition offered by the People would relieve a district attorney of those responsibilities even when it is apparent that there are systemic problems in the office's discovery process. It would also make it too easy for pattern discovery violations to repeatedly occur without consequence. Such a standard is plainly at odds with the purpose of deterrent discovery sanctions, which is to sufficiently encourage a "modification of a party's discovery practices." *Daley*, 97 P.3d at 298.

¶51     For these reasons, we decline to adopt the pattern definition suggested by the District Attorney's Office and conclude it had adequate notice regarding the claims that it engaged in a pattern of discovery violations.

### 3. The District Court Properly Sanctioned for Deterrence Purposes

¶52 The People next contend that the district court's sanction was too harsh for discovery violations that were not willful. They assert that "[t]he most severe sanctions are reserved for conduct that is willful," and that the district court did not find that their discovery violations were willful. We disagree, both because this argument misapprehends the difference between deterrent and curative sanctions and misconstrues the basis for the district court's order.

¶53 As noted, discovery sanctions serve the dual purposes of "protecting the integrity of the truth-finding process and deterring discovery-related misconduct." *Lee*, 18 P.3d at 196. Fashioning a sanction for the purpose of deterrence is appropriate where the district court finds either "willful misconduct *or* a pattern of neglect demonstrating a need for modification of a party's discovery practices." *Id.* (emphasis added). Here, the district court made detailed findings regarding twenty of the almost thirty prior discovery violation cases that Tippet identified in his first motion to dismiss, concluding that the "pattern of neglect reveal[ed] an urgent and serious need for the District Attorney to modify its discovery practices."

¶54 The district court explicitly discussed the difficulty it once again faced in fashioning sanctions to deter future Rule 16 violations by the District Attorney's Office, while also preserving the truth-seeking function of discovery. After

25

emphasizing that "[p]reviously imposed sanctions have not proven effective in spurring the District Attorney to remedy its pattern of neglect," the court ultimately concluded that the least severe sanction it could impose to deter continuing Rule 16 violations, while also preserving the truth-seeking function of discovery, was to reduce Tippet's first degree murder charge to second degree murder.

¶55    So while the People are correct that the district court did not make an *explicit* finding of willfulness, the protracted, ongoing pattern discovery violations, in the face of repeated admonishments from the court about the systemic lack of oversight and supervision in the District Attorney's Office's discovery process, could certainly be considered willful.

¶56    And in any event, the People's argument misses the mark because the court had an alternative basis to impose a deterrent sanction: to encourage the District Attorney's Office to modify its discovery practices.

### 4. Tippet Suffered Prejudice as a Result of the Discovery Delays

¶57    Next, the People contend that the district court's choice of sanction was improper because Tippet was not prejudiced by the discovery violations. They argue that the violations could not have prejudiced Tippet given what they describe as a short delay in the setting of the preliminary hearing. Again, we are not persuaded.

¶58 The district court concluded that the discovery violations "affected the defendant's rights to effective assistance of counsel, to confrontation, and to due process." Specifically, the court found that the late disclosures "prevented defense counsel from conducting a thorough investigation of the facts." This, in turn, delayed setting the preliminary hearing.

¶59 The district court did not abuse its discretion by reaching this conclusion. Defense counsel filed a request to set a preliminary hearing on January 8. Until shortly before the sanctions hearing on March 31, Tippet had not received 85% of the outstanding discovery, most of which was created back in January 2023, either before or shortly after Tippet asked the magistrate to set a preliminary hearing. Documents and materials not timely produced included Tippet's alleged voicemails to a witness, his interrogation, the coroner report, the autopsy and toxicology reports, surveillance footage of Tippet, nearly all photographs of the crime scene and vehicles, nearly all reports and body-worn camera video from five of the investigating agencies, a witness interview, and evidence summary reports.

¶60 Because of the People's discovery violations, Tippet was forced to choose between his right to "receive a preliminary hearing within a reasonable time" and his counsel's ability to review the evidence and adequately prepare for that hearing. Crim. P. 5(a)(2)(VIII). And, notably, on the date of the sanctions hearing—some fifty-one days after the Rule 16(I)(b)(1) deadline—and following

multiple hearings dominated by discussions regarding the People's discovery violations, the District Attorney's Office still had not met all of its discovery obligations.

¶61 We are not persuaded by the People's argument that the district court's choice of sanction was improper because Tippet was not prejudiced. To be sure, the prejudice to Tippet of these discovery violations at this early stage of the proceeding is different than the prejudice a defendant faces when significant discovery violations occur shortly before or during trial. But it is prejudice. And recall, the district court was not weighing the imposition of a *curative* sanction. Rather, the court was considering Tippet's request for a deterrent sanction. Having found a long-standing history of pattern discovery violations, the court's goal was not simply to cure the prejudice resulting from the violations in this case, but instead was to encourage the District Attorney's Office to finally commit the managerial, supervisory, and training resources necessary to resolve its intractable, systemic pattern of discovery violations. *See Daley*, 97 P.3d at 299 (holding "[t]here was no showing of a . . . need for deterrence, and therefore, the trial court should have considered only curative sanctions").

¶62 But what about the People's argument that Tippet was not prejudiced because he confessed, and they produced the confession? We flatly reject this reasoning. Rule 16(I)(a)(1)'s obligations are self-executing no matter the

circumstances. The prosecution is not entitled to disregard its discovery obligations because it believes it has a strong case.

¶63 For these reasons, we conclude that the district court did not abuse its discretion by concluding that Tippet was prejudiced by the District Attorney's Office's discovery violations.

## 5. The District Court Did Not Abuse Its Discretion

¶64 Next, we consider whether the district court's choice of sanction was an abuse of discretion. Under the abuse of discretion standard, a reviewing court doesn't ask whether it would have ruled as the trial court did, but instead considers "whether the trial court's decision fell within a range of reasonable options." *Churchill v. Univ. of Colo. at Boulder*, 2012 CO 54, ¶ 74, 285 P.3d 986, 1008 (quoting *E-470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230–31 (Colo. App. 2006)).

¶65 Here, the court had limited options from which to select an appropriate sanction to serve the dual purposes of "protecting the integrity of the truth-finding process and deterring discovery-related misconduct." *Lee*, 18 P.3d at 196. First, ordering a continuance would not have served either purpose. It would not have remedied prejudice to Tippet because the delay in the proceedings was the *source* of the prejudice. Nor would a continuance have served as a deterrent: Granting a delay due to this type of ongoing pattern discovery violation is no deterrent at all.

29

¶66 Second, while the court could have reduced Tippet's bond, history indicated that this approach had not worked to modify the District Attorney's Office's oversight of its discovery practices.

¶67 Third, given the nature of the evidence contained in the delayed discovery, ordering the exclusion of any late-disclosed evidence could have forced the District Attorney's Office to voluntarily dismiss the charges against Tippet entirely. On these facts, exclusion would have been an extreme remedy that would not have furthered the search for the truth. *See Cobb*, 962 P.2d at 949 ("[E]xclusion is a drastic remedy and therefore is strongly disfavored, especially since in many cases it may well determine the outcome of the trial."); *see also Lee*, 18 P.3d at 197 ("[A] trial court should avoid excluding evidence . . . because the attendant windfall to the party against whom such evidence would have been offered defeats, rather than furthers, the objectives of discovery.").

¶68 Fourth, a complete dismissal of the case would have been the most severe sanction, and like the exclusion of evidence, would not have served the truth-seeking purpose of the criminal justice system. *See Daley*, 97 P.3d at 298 ("Dismissal is a drastic sanction . . . usually beyond the discretion of the trial court.").

¶69 Moreover, the district court found that "[p]reviously imposed sanctions [had] not proven effective in spurring the District Attorney to remedy its pattern

of neglect." Thus, it was reasonable on these specific facts for the district court to conclude that its choice of sanction was the "least severe sanction that [would] ensure . . . full compliance with the court's discovery orders." *People v. Dist. Ct.*, 808 P.2d 831, 836–37 (Colo. 1991) (citing *Dist. Ct.*, 793 P.2d at 168). We are mindful that reducing a murder charge is an exceptionally severe sanction. Like dismissal, reducing charges should be a disfavored remedy reserved for rare cases. *People ex rel. Gallagher v. Dist. Ct.*, 656 P.2d 1287, 1293 (Colo. 1983).

¶70 However, given the court's findings that the violations in this case continue the District Attorney's Office's two-year long pattern and practice of neglect of its discovery obligations that has persisted, notwithstanding repeated admonitions by multiple judicial officers in the Eleventh Judicial District, and the imposition of many and varied sanctions against the office in numerous documented cases, we cannot conclude that the court abused its discretion by reducing the charge as a deterrent sanction.

### 6. The District Court Possessed Authority to Reduce Charges as a Discovery Sanction

¶71 Finally, the People contend that the district court lacked the authority to reduce the charge as a sanction for their discovery violations. As outlined above, district courts have broad discretion to impose sanctions for discovery violations. *See Lee*, 18 P.3d at 196 ("Because of the multiplicity of considerations involved and the uniqueness of each case, great deference is owed to trial courts" in their

decisions to impose discovery sanctions.). Such discretion includes, on rare occasions, dismissing individual counts or even all charges against a defendant for willful or pattern discovery violations. *See Thurman*, 787 P.2d at 655–56 (affirming the trial court's dismissal of the defendant's charge as a Rule 16 discovery sanction for the prosecution's refusal to disclose information about their confidential informant); *see also People v. Alberico*, 817 P.2d 573, 576 (Colo. App. 1991) ("While it is true that the dismissal of a criminal charge is the most severe sanction, nevertheless, the nature of the sanctions to be imposed for failure to comply with Crim.P. 16 generally rests within the trial court's sound discretion.").

¶72 We conclude in this context that the greater power to dismiss a charge includes the lesser power to reduce a charge. *See People v. Severin*, 122 P.3d 1073, 1074 (Colo. App. 2005) ("In reducing a charge . . . a court in effect dismisses the greater charge and substitutes a lesser one."). The People concede as much, acknowledging that appellate courts have occasionally upheld dismissal as a discovery sanction. But they maintain that what the court did in this case is legally distinct. They assert, for the first time in their petition, that the district court's order violated the separation of powers doctrine because the decision to file charges is within the discretion of the district attorney, a member of the executive branch. We reject this claim for two reasons.

¶73 First, because the People failed to raise their separation of powers argument before the district court, they have waived the issue. *See Hernandez*, ¶ 35, 488 P.3d at 1063 (finding waiver in the Rule 21 context where the defendant failed to raise his public trial claim before the trial court). Second, it was, in any event, the district court that reduced the charge. Contrary to the People's argument, the court did not order the prosecution to reduce the charge. Rather, it reduced the charge and directed the prosecution to file an amended complaint conforming to the court's order. Thus, the district court acted within the scope of its authority by reducing Tippet's murder charge as a deterrent sanction.

## III. Conclusion

¶74 For the foregoing reasons, we conclude that the district court did not abuse its discretion by reducing the charge against Tippet as a deterrent discovery sanction and directing the District Attorney's Office to file an amended complaint consistent with the court's order. Accordingly, we discharge the rule to show cause.

**JUSTICE SAMOUR**, joined by **CHIEF JUSTICE BOATRIGHT** and **JUSTICE MÁRQUEZ**, dissented.

JUSTICE SAMOUR, joined by CHIEF JUSTICE BOATRIGHT and JUSTICE MÁRQUEZ, dissenting.

¶75    "And now . . . the rest of the story."[1]

¶76    I write separately not so much because of what the majority says but because of what the majority doesn't say.  There is no dispute that there were discovery violations by the prosecution here.  Nor can anyone objectively disagree that this District Attorney's Office has consistently struggled to provide discovery in a timely manner.  Under the circumstances, it is understandable that defense counsel, the magistrate, and the district court judge expressed frustration.  But that's not the end of the story.

¶77    On March 22, 2023, following several hearings during which the prosecution's discovery obligations were discussed, the magistrate imposed a final discovery deadline and announced that there may be sanctions *if the prosecution failed to comply with it*.  Here's what the magistrate said:

> I'm going to set this over for seven days to next week, next Wednesday[, March 29], *and if you have not provided all of the discovery that's required under the rule at that time, I'm going to set a sanctions hearing* in Division 1 with Judge Turner.  And you risk then . . . the

---

[1] "The Rest of the Story," a Monday-through-Friday radio program that aired between 1976 and 2009, was hosted by famed commentator Paul Harvey.  *See The Rest of the Story* (ABC Radio Networks broadcast May 10, 1976).  In each program, Harvey told a story about a little-known or forgotten matter, leaving an important and usually surprising nugget of information until the end.  *Id.*  As every episode unfolded, Harvey encouraged his audience to stay tuned for "the rest of the story."

sanction[] of possibly a lesser charge being filed or something like that.

But you have to do your job. You simply have to do it . . . . And you're going to do it, *and you're going to do it by next week, and if it's not done, then the sanctions hearing will be set.*

(Emphases added.) The next day, March 23, the magistrate followed up with a written order requiring the prosecution to "file a written certification . . . certifying that they have discovered all evidentiary materials in this case, within their possession or control, as set forth in Part I, Rule 16, [of the] Colorado Rules of Criminal Procedure." The magistrate further instructed the parties to be available on Friday, March 31, at 2:00 p.m., in case he later determined that a sanctions hearing in front of the district court judge was necessary.

¶78 On March 28, before the deadline imposed by the magistrate expired, the prosecution filed a "Compliance Certificate." The prosecution represented that it had now discovered all documentary and media evidence in the possession or control of every law enforcement agency involved in the investigation of this case: the Fremont County Sheriff's Office, the Chaffee County Sheriff's Office, the Cañon City Police Department, the Salida Police Department, and the Colorado State Patrol. Per the Compliance Certificate, each of these agencies had confirmed that all "non-physical evidence . . . in their possession or control" had been produced. All told, the prosecution had provided over 1,100 additional pages or items of discovery since March 22—prior to that, the prosecution had provided

2

190 pages or items of discovery. The Compliance Certificate did indicate that the prosecution was still awaiting "a response" from FRECOM, the Fremont County Communications entity that manages dispatch recordings, although some files from that entity had already been received and produced.

¶79 The defense submitted a response the same day complaining that the Compliance Certificate demonstrated the prosecution had withheld approximately 85% of the discovery until the last six days. Further, defense counsel asserted that he believed the law enforcement agencies involved in this case still had "correspondence" with the prosecution and "police notes" that needed to be disclosed.

¶80 At the hearing held the next day, March 29, the prosecutor stressed that, as reflected in the Compliance Certificate, his office had contacted every law enforcement agency involved in this case "to say, 'here's a list of everything we've received; do you have literally anything else?'" And, he continued, "they've all said 'no.'" The prosecutor did acknowledge one exception, FRECOM, but he was expecting that FRECOM would respond later that day.

¶81 Importantly, defense counsel stated that he was satisfied that he had now received the bulk of the discovery in this case. Additionally, he clarified that he had not requested a personal recognizance bond for his client. Instead, he explained, he'd moved for sanctions and left it "to th[e] court's discretion to

3

consider a personal recognizance bond if the discovery violations continue to persist." After confirming receipt of the Compliance Certificate and informing the court that he and the prosecutor had engaged in a fruitful conversation about the case (their first in-person conversation about the case), defense counsel reiterated that he was "leav[ing] it to th[e] court's discretion as to what is set next." He specifically indicated that, while he was aware of the placeholder sanctions hearing set two days later in front of Judge Turner, he was "leav[ing] it in th[e] court's discretion as to what th[e] court wants to do."

¶82 Defense counsel didn't repeat the complaint he'd included in his response the previous day about the prosecution's delay in producing approximately 85% of the discovery. The magistrate nevertheless decided to confront the prosecutor precisely about that complaint:

> I guess the question that I have is that in the past seven days now, since the last order was issued, by my calculation the [prosecution] has now produced an additional 1,159 pages of discovery . . . , which represents 85% of the discovery. And so my question is, did you have it and then produce it in the last seven days or did you have to go get it?

¶83 The prosecutor responded that his office "had to go get" the discovery recently produced. He stated that his office had requested these materials from the multiple law enforcement agencies in question but had not received them until recently. The magistrate then asked if this was "indicative of a systemic problem." Initially, the prosecutor said he couldn't comment on that question, but he later

4

told the court that he didn't know the answer. Although defense counsel opined that this was a systemic problem, he again left it to the court's discretion as to how to proceed. The magistrate ultimately said that he was "glad . . . this information was produced" and that the case would now be "moving forward." But because he was concerned about the timeliness of the discovery recently produced, he felt it was appropriate for the district court judge "to at least weigh in on what her expectations are going forward" and to decide "[w]hether . . . to take any action at this time."

¶84 No one mentioned the reduction of charges as a potential sanction at any point during the March 29 hearing. In fact, defense counsel told the court that, after the "helpful" conversation he and the prosecutor had just had, he was confident they would work well together and communicate effectively moving forward, so it was "likely[] this case [was] going to go better now." The prosecutor echoed that sentiment. And defense counsel repeatedly said he was leaving it to the court's discretion to decide how to proceed vis-à-vis the placeholder sanctions hearing set two days later.

¶85 Yet, following the March 31 hearing, the district court judge imposed one of the most severe sanctions available. She reduced the main charge from murder in the first degree to murder in the second degree. In describing this as "the least severe sanction" that could have been imposed to deter continuing Rule 16

violations, the district court judge overlooked the severity of a charge reduction. That type of severe sanction should be reserved for the rarest of situations. Had the district court judge reduced the primary charge here *after finding that the prosecution failed to meet the March 29 deadline imposed by the magistrate on March 22*, perhaps I wouldn't be writing separately. As it is, though, the record contains no such finding.[2] Instead, the district court judge imposed sanctions for (1) violations of "Rule 16 . . . with respect to disclosures . . . made *after February 8, 2023*, of items that were in the possession of law enforcement agencies *before then*"; and (2) a pattern of such violations that existed at that time despite "many and varied sanctions" in other cases. (Emphases added.)

¶86 Notably, in her brief before us, the district court judge does not attempt to justify the sanction imposed based on a violation of the March 29 deadline. In fact, the district court judge doesn't even mention that the prosecution failed to comply with that deadline. No, the district court judge admits that she sanctioned the prosecution because of the discovery violations that occurred *as of February 8 and the pattern of discovery violations that existed at that time*.

---

[2] At the March 31 sanctions hearing, defense counsel reiterated that he was still missing some "police notes" and some "correspondence" between law enforcement and the prosecution. But that discovery was required by the January 28, 2023 order, not Crim. P. 16, and the district court judge's sanction was based on the prosecution's violation of Crim. P. 16. In any event, the court gave the prosecution until April 5 to comply with the January 28 order, and the prosecution appears to have done so.

¶87    I understand that the February 8 deadline is rooted in Crim. P. 16.  And I accept the district court judge's finding of a pattern of discovery violations.  But on March 22, the magistrate conveyed to the prosecution, in no uncertain terms, that it needed to comply with the March 29 deadline to avoid sanctions.  The prosecution appears to have done so.  What gives, then?  The February 8 deadline to which the sanctions were anchored had already come and gone when the magistrate gave the prosecution until March 29 to produce all the discovery.  Given the prosecution's apparent compliance with the magistrate's March 29 deadline, how is the district court judge's sanction fair?

¶88    The prosecutor was understandably surprised at the March 31 hearing when the district court judge indicated she was considering a sanction.  Although the prosecutor recognized the magistrate had decided the March 31 hearing should go forward, he noted that he had complied with the March 29 deadline set on March 22:

> [T]he request [by] Magistrate Meyrick was to be compliant with discovery by Wednesday [March 29].  And then depending on the status of that compliance, whether a hearing would be set.  There wasn't an indication from Magistrate Meyrick that he believed we were non-compliant . . . .

¶89    The prosecutor was spot-on.  When a judicial officer tells a party that it must comply with a deadline or there may be sanctions, and the party then proceeds to comply with that deadline, it is an abuse of discretion for the judicial officer to

7

impose sanctions anyway. If that's not an abuse of discretion, I'm not sure what is.

¶90 The sense I get from reviewing this record (especially the transcripts of the hearings) is that the judicial officers in question were at their wits' end with this District Attorney's Office and wanted to send a message that would finally be effective. They were looking for an opportunity to impose a severe sanction. Having sat on a trial court for many years, I understand their frustration. But that doesn't justify the severe sanction handed out here, which seems capricious and forced.

¶91 I worry about the optics of that sanction under the circumstances in which it was imposed. And I worry about the precedent today's decision may inadvertently set. Because there was no finding that the prosecution failed to comply with the March 29 deadline, the charge of murder in the first degree should not have been reduced. This is especially so given that defense counsel didn't actively advocate for a sanction on March 29; instead, he left the matter in the court's discretion, explaining that he finally had all the discovery covered by Crim. P. 16, that he and the prosecutor had just had a very productive conversation about the case, and that he was feeling optimistic about how the case would proceed moving forward. Why the magistrate didn't simply vacate the placeholder sanctions hearing at that point in time is not clear from the record.

¶92 The severe sanction imposed here was particularly improper given that this case is in its infancy. As the district court judge herself recognizes in the brief before us, our cases approving severe sanctions deal with late-breaking violations—whether shortly before trial or during trial—that are very prejudicial to the defendant. Contrary to the district court judge's contention, our legal framework doesn't "overlook[] early-stage discovery obligations." Rather, we haven't seen fit to affirm severe sanctions for violations of early discovery obligations because such violations are generally not prejudicial to a defendant.

¶93 Our jurisprudence makes clear that a severe sanction like reduction of charges should rarely be imposed—and should be imposed only when absolutely necessary. *See People v. Dist. Ct.*, 793 P.2d 163, 168 (Colo. 1990) ("When a party violates Rule 16, we believe the court should impose the least severe sanction that will ensure that there is full compliance with the court's discovery orders."); *People v. Roan*, 685 P.2d 1369, 1371 (Colo. 1984) (comparing "reduction of the charges" to "dismissal," stating that it is a "drastic" sanction, and holding that it was "more severe than was necessary"); *Kallas v. Spinozzi*, 2014 COA 164, ¶¶ 16, 37, 342 P.3d 607, 610, 613 (noting that a "severe sanction," such as "striking [an] expert," should only be imposed in "rare cases with extreme circumstances"). This type of sanction, while aimed at the District Attorney's Office, actually punishes the victims—unfairly so—because it robs them of their right to seek justice for the

9

alleged crime. It also stymies the mission of our criminal justice system to hold accountable those who commit crimes. Inasmuch as the prosecution obviously believes that Tippet committed the crime of murder in the first degree, he ought to stand charged of murder in the first degree. He shouldn't get a freebie by having the charge lowered to murder in the second degree, especially when the District Attorney's Office appears to have complied with the final discovery deadline imposed by the magistrate.

¶94 Don't get me wrong—sanctions have a place in our criminal justice system, including for discovery violations. But here, the magistrate told the prosecution that it had until March 29 to comply with its discovery obligations or sanctions could be imposed, and the prosecution appears to have met that deadline. Therefore, it was clearly an abuse of discretion for the court to impose sanctions.

¶95 This sanction was utterly unjust. I therefore respectfully dissent.

¶96 "And now you know the rest of the story."[3]

I am authorized to state that CHIEF JUSTICE BOATRIGHT and JUSTICE MÁRQUEZ join in this dissent.

---

[3] *See supra* note 1.