22CA2250 Peo v Giovanni 06-12-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA2250
Arapahoe County District Court No. 22CR272
Honorable Eric B. White, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Sean Christopher Giovanni,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Martinez* and Bernard*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 12, 2025

Philip J. Weiser, Attorney General, Sonia Raichur Russo, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jessica A. Pitts, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Defendant, Sean Christopher Giovanni, appeals his conviction of unlawful possession of a controlled substance and a special offender sentence enhancer. We affirm.

I.     Background

¶ 2     Around 2:30 a.m. one January morning in 2022, Officer Nicholas Whittenberg responded to a call at a gas station. When he arrived on the scene, Officer Whittenberg talked to an employee, who told him that two people had taken a container of antifreeze without paying and that they were in a vehicle parked by the gas pumps.

¶ 3     So Officer Whittenberg approached the vehicle — which had broken down and wouldn't start — and discovered four people inside. One of the occupants in the back seat admitted to Officer Whittenberg that he had taken the antifreeze and said he had told the cashier he would return the next day to pay for it.

¶ 4     While Officer Whittenberg was speaking to the occupants of the vehicle, he noticed that they were making furtive gestures and reaching into different areas of the car. Giovanni was in the driver's seat. Officer Whittenberg asked Giovanni to keep his door open because the occupants' movements and gestures were making him

1

nervous.  Particularly, Officer Whittenberg noticed that Giovanni lit a cigarette and was moving a Windex bottle around the center console area of the vehicle, the two people in the back seat were reaching into a pile of clothes, and there was a lockbox on the floorboard in the front of the vehicle that appeared to be designed to hold a gun.  Officer Whittenberg decided to remove all of the occupants from the vehicle and frisk them for weapons.  After frisking Giovanni, Officer Whittenberg put him in the back of his patrol car to stay warm.  Officer Whittenberg searched the car for weapons and initially found what he suspected to be methamphetamine residue on the back seat and rear floorboard, a glass pipe, and an empty gun holster underneath the Windex bottle in between the front seat and the center console.  Officer Whittenberg broke open the lockbox and inside found a handgun, a pipe for smoking methamphetamine, and a small baggie filled with what appeared to be methamphetamine.

¶ 5      Giovanni was arrested and charged with unlawful possession of a controlled substance, possession of a weapon by a previous offender (POWPO), violation of a protection order, and a special offender count.  Ultimately, the POWPO and violation of a protection

order charges were dropped, and the jury convicted Giovanni of unlawful possession of a controlled substance and the special offender sentence enhancer.[1]

## II. Issues Presented on Appeal

¶ 6     Giovanni argues that the court erred by (1) demonstrating actual bias against him when it made credibility determinations adverse to him at a pretrial hearing; (2) failing to suppress evidence that he claims was obtained through an illegal search; (3) failing to order meaningful sanctions against the prosecution for disclosing evidence after the discovery cutoff; and (4) allowing two witnesses to offer expert testimony without having been endorsed or qualified as experts.  We address and reject each contention in turn below.

### A. Judicial Bias

¶ 7     Giovanni first argues that the judge who presided over his case was biased against him because at a pretrial evidentiary hearing the judge made a credibility determination favoring Officer Whittenberg's testimony over his based solely on Giovanni's status

---

[1] The special offender charge was based on the presence of the firearm in the vehicle.  According to section 18-18-407(1)(d)(II), C.R.S. 2024, if the defendant or a confederate possesses a handgun, the defendant can be charged as a special offender.

as the defendant and Officer Whittenberg's status as a police officer. Giovanni argues that the judge's basis in making the credibility determination demonstrated actual bias against him and requires reversal of his conviction and a new trial before an unbiased judge. We disagree.

### 1.    Additional Facts

¶ 8    At a pretrial hearing on Giovanni's suppression motion, Officer Whittenberg and Giovanni gave conflicting testimony regarding whether Officer Whittenberg first talked to Giovanni before or after the officer had talked to the store clerk.  Officer Whittenberg testified that he didn't speak to Giovanni until after he had spoken to the store clerk.  Giovanni, in contrast, testified that he was standing outside his car as Officer Whittenberg was walking to the store to talk to the clerk initially when Officer Whittenberg ordered Giovanni to get back into his car.[2]

¶ 9    The court made the following credibility determination in the course of denying Giovanni's motion to suppress:

---

[2] According to Giovanni, the timing of this contact is relevant to his suppression motion, as he argues that Officer Whittenberg seized him by directing him to return to the car before the officer had any information regarding the antifreeze theft from the store clerk.

4

> The Court has heard the testimony of Officer Whittenberg. The Court also heard the testimony of the defendant. . . . As it relates then to the seizure issue under the Fourth Amendment, that specific issue the Court finds credible the testimony of Officer Whittenberg. The Court doesn't find credible the testimony of the defendant. It's self-serving. The defendant has every reason to be dishonest with the Court as to the interaction he had with law enforcement and law enforcement has no reason to lie to this Court, so I do find that the officer's testimony related to his initial interaction with the defendant was truthful and I will rely upon it finding the defendant's testimony not to be.

¶ 10    A few days after the hearing, Giovanni submitted a pro se letter to the court complaining that the judge's comments during the hearing had exhibited bias and said that the judge should recuse himself.

¶ 11    At the outset of the next pretrial hearing, Giovanni's counsel asked to address Giovanni's letter and explained his client's apprehension, as follows:

> [Defense Counsel]: Your Honor, Mr. Giovanni had concerns following the motion's hearing in April based off your findings that his testimony was not credible merely because he was the defendant. His fear is that bias might be shown in front of the jury and was not based off his appearance or demeanor at the trial [sic] but rather simply because he is the

5

defendant and accused even though he should — he is still presumed innocent and so, Your Honor, Mr. Giovanni did want that addressed with the Court. Obviously, as we approach trial we would ask that the Court not, you know, make any such statements like that to the jury or express those statements to the jury in any way, but that is a concern Mr. Giovanni had and just wanted on the record that he felt that was demonstrated bias not based off the facts presented in the motion's hearing.

THE COURT: Any response from the People?

[Prosecutor]: No, Your Honor.

THE COURT: . . . The Court did find the defendant not to be credible in his testimony. I'll persist in that finding. I didn't find him believable. The record should reflect he's got eight prior felony convictions. I can consider felony convictions for purposes of credibility, and even setting that aside, I just didn't find him believable. Having said that, Mr. Giovanni is correct that the Court need not put its finger on the scale of the jury's determination at the trial and I don't intend to do that. The jury will never know that I don't think that the defendant's telling the truth. The jury will decide whether or not it believes that the defendant is guilty or not guilty of the offenses charged, and to be clear, the defendant need prove nothing. It is the People's burden fully, that is, beyond a reasonable doubt to prove these allegations against the defendant. So the People, if they meet their burden, the jury will make its findings . . . and I will not make any comments to the jury about the conduct of

6

the motion's hearing or my belief the defendant's not credible.  The jury will never hear that from me.

[Defense Counsel]: The defense has nothing further.

¶ 12      Neither the court nor the parties referenced this exchange or the court's credibility determination during the trial.

### 2.      Preservation, Standard of Review, and Relevant Law

¶ 13      We review whether the judge was required to recuse himself as a question of law, which we review de novo.  *Sanders v. People*, 2024 CO 33, ¶ 25.  The appearance of impropriety or actual bias can serve as the grounds for recusal, but when a party doesn't move for recusal we will only reverse if the judge was actually biased.  *People v. Garcia*, 2024 CO 41M, ¶ 21.  When an actually biased judge presides over a trial it is structural error.  *Hagos v. People*, 2012 CO 63, ¶ 10.

¶ 14      Actual bias will probably prevent a judge from treating a party fairly.  *People v. Jennings*, 2021 COA 112, ¶ 28.  To prove a judge was actually biased against them, a defendant must show the record clearly establishes that the judge had a "substantial bent of

mind" against them. *People v. Drake*, 748 P.2d 1237, 1249 (Colo. 1988).

### 3.     Analysis

¶ 15     We begin with preservation. Giovanni argues that he preserved the issue of recusal for judicial bias when he sent his pro se letter following the suppression hearing. That letter, however, didn't preserve the issue Giovanni advances on appeal. A trial court isn't required to consider pro se filings from represented defendants. *People v. Draper*, 2021 COA 120, ¶ 53, *overruled on other grounds by Garcia v. People*, 2023 CO 30, ¶ 22. Therefore, the pro se letter didn't serve as a motion for the judge to recuse himself. And when counsel had the opportunity to address the court regarding Giovanni's letter, Giovanni's counsel only requested that the judge not tell the jury he had found Giovanni not credible. Counsel never asked the judge to recuse himself. Because there was never a motion for recusal, we will reverse only if there was actual bias. *See Garcia*, 2024 CO 41M, ¶ 21. Now we turn to the merits of that contention.

¶ 16     Giovanni argues that the trial judge was biased against him because the judge explained his credibility findings exclusively in

terms of the witnesses' statuses: Giovanni wasn't credible because his testimony was "self-serving" because he was the defendant, and Officer Whittenberg's testimony was credible because he was a police officer and "law enforcement has no reason to lie to this Court." Giovanni also argues that the judge's statement contravenes the axiom that all defendants are presumed innocent.[3]

¶ 17    First, we disagree that the judge credited Officer Whittenberg's testimony over Giovanni's based solely on their respective roles at trial. The judge had reviewed the officer's bodycam footage before making his credibility determination. Thus, the court's

---

[3] Giovanni testified that Officer Whittenberg told him to get back into his car when he arrived at the gas station, and he contended that there was no recording of this interaction because Officer Whittenberg hadn't turned on his body camera in violation of section 24-31-902(1)(a)(II)(A), C.R.S. 2024, which says that peace officers should turn on their body-worn cameras "shortly before the vehicle approaches the scene." At the suppression hearing, Giovanni argued that the court should have invoked — or at least considered invoking — the permissive adverse inference allowed by section 24-31-902(1)(a)(III) against Officer Whittenberg in its credibility determination. But whether Officer Whittenberg belatedly turned on his body camera at all — and thus could have been subject to an adverse inference — turned on whose testimony the court credited in the first instance. And as noted, the court found Officer Whittenberg to be credible and Giovanni not. Based on this, it's logical that the court didn't apply any adverse inference against Officer Whittenberg, as it didn't find the premise of the claim that he turned on his body camera late to be credible.

determination was based on more than just the testimony of the two parties. Moreover, when the judge responded to Giovanni's concerns that he might be biased, the judge clarified that he didn't find Giovanni credible partly because of Giovanni's eight previous felonies.

¶ 18 Second, we disagree that the judge's credibility determination contravened Giovanni's right to be presumed innocent. During any evidentiary hearing, the court has to make credibility findings regarding the witnesses, particularly when there is conflicting testimony. *See, e.g.*, *People v. Pearson*, 725 P.2d 782, 786 (Colo. 1986) (Quinn, C.J., dissenting) ("The empirical component of a suppression ruling, like any other form of fact finding, is the basic responsibility of the trial court, involving as it does a weighing of evidence and an assessment of credibility."). And making adverse credibility findings in the course of ruling on an evidentiary motion isn't indicative of judicial bias. *Cf. Bocian v. Owners Ins. Co.*, 2020 COA 98, ¶ 23 ("[I]t is well established that adverse legal rulings, standing alone, do not constitute grounds for claiming prejudice or bias." (first citing *In re Marriage of Hatton*, 160 P.3d 326, 330 (Colo.

App. 2007); and then citing *People in Interest of S.G.*, 91 P.3d 443, 447 (Colo. App. 2004))).

¶ 19 Moreover, during the court's colloquy with Giovanni's counsel, the judge assured Giovanni's counsel that the jury would never know that the court had found Giovanni to lack credibility. This affirmation runs contrary to Giovanni's contention that the judge was biased. Giovanni doesn't offer any other evidence of the judge's supposed bias against him. *See Jennings*, ¶ 28 (To establish actual bias, "[t]he record must establish such bias clearly; mere speculative statements and conclusions are not enough." (citing *Drake*, 748 P.2d at 1249)).

¶ 20 Additionally, the judge explicitly reaffirmed Giovanni's right to be presumed innocent when he explained that Giovanni didn't need to prove anything and that the prosecution needed to prove all of the elements of the charged crimes. This statement disavowing the type of bias alleged by Giovanni is consistent with the judge's conduct during trial and contradicts the basis for Giovanni's claim of actual bias. *Id.*

¶ 21 To put it simply, we discern no judicial bias against Giovanni, or for the prosecution, and therefore no basis for reversal.

## B. Suppression of Evidence

¶ 22 Next, Giovanni argues that the trial court erred by allowing the evidence discovered in the vehicle to be admitted at trial. He contends that all of the evidence Officer Whittenberg found in the car should have been suppressed because it was found after Officer Whittenberg unconstitutionally seized Giovanni by asking him to keep his door open, and all of the seized evidence was the fruit of an unconstitutional seizure of his person. We disagree.

### 1. Additional Facts

¶ 23 According to testimony offered at the suppression hearing, when Officer Whittenberg made contact with the occupants of the vehicle, he initially began talking to the person in the front passenger seat. While he was talking to the front seat passenger, the passenger behind the driver admitted to taking the antifreeze but also claimed that another occupant had paid for it or that he had told the cashier that he would return the next day to pay for it. Officer Whittenberg then walked around the front of the vehicle to talk to the passenger directly behind the driver. As he made his way past Giovanni (who was sitting in the driver's seat), Officer Whittenberg asked Giovanni, "Do you mind just leaving the door

open?" Giovanni replied, "All right, that's fine, I'm just freezing." Officer Whittenberg responded, "All right, you guys are just making me a little nervous, reaching around the car and everything."

¶ 24    At this point, Officer Whittenberg decided to have the occupants of the car exit the vehicle to be patted down for weapons and to search the vehicle for weapons. Officer Whittenberg testified that, as he started removing the passengers from the vehicle, he saw several knives, a baseball bat tucked under the rear passenger's seat, and a lockbox.

¶ 25    Once the passengers had exited the vehicle, Officer Whittenberg began searching the passenger compartment of the vehicle. During his search of the vehicle, Officer Whittenberg found an empty handgun holster in between the seat and the center console where Giovanni had been moving the Windex bottle around. Officer Whittenberg also found a glass pipe and suspected methamphetamine residue in the pile of clothes that the passengers in the back seat had been reaching into. Based on his discovery of the pipe, the methamphetamine residue, and the empty holster, Officer Whittenberg decided to continue searching the car for drugs and weapons. Eventually he found and opened a small lockbox

that he said appeared to be designed to hold a gun. Inside the lockbox, Officer Whittenberg found a handgun, another glass pipe, and a small bag of what he suspected to be methamphetamine.

¶ 26 Before trial, Giovanni filed a motion to suppress the evidence seized in the search of the vehicle, asserting, among other things, that the evidence was the fruit of Officer Whittenberg's unlawful seizure of him.

¶ 27 At the pretrial hearing, the trial court made findings based on the testimony of Officer Whittenberg and Giovanni, as well as Officer Whittenberg's bodycam footage. First the court found that Officer Whittenberg's initial search of the occupants of the vehicle and the vehicle itself was a justified protective sweep:

> The officer observed the defendant to be reaching in and out of his jacket, to have moved a bottle of Windex to the — or towards or on the center console of the vehicle. The officer observed, if I understood his testimony as well as the body-worn camera footage, the rear passengers of the vehicle to be fidgety, to be reaching around inside the vehicle. All of the occupants of the vehicle, particularly the defendant, was [sic] wearing winter coats. The officer testified that the passengers were wearing not only bulky clothing but multiple layers, I think of pants, he even testified. I observed on the body-worn camera video the front passenger to have a winter coat on and

14

multiple layers as well.  At that time the officer was concerned for his safety as well as those of his fellow officers regarding what may be in the vehicle, not only stolen antifreeze but at this point anything that could hurt him — those are my words, not his — so he elected to have the occupants of the vehicle, including the defendant, removed at which point he undertook a more extensive, I'll call it a protective sweep of the vehicle, to make sure that there was nothing there that could hurt him or his fellow officers.  He said at least twice on the body camera footage on Exhibit B that he was concerned with the way the occupants of the vehicle were acting. . . .  So as he then swept through the vehicle, that was for purposes of his safety.  That's a limited intrusion under the Fourth Amendment.

¶ 28    Last, the court determined that Officer Whittenberg had probable cause to search the car for drugs after finding the fresh methamphetamine residue:

At some point during that search Officer Whittenberg found what he determined to be methamphetamine powder. . . .  There was residue in a plastic bag or baggies.  He testified there was freshly strewn powder on the floor. . . .  [C]ertainly no later than the point that the officer found what appeared to be methamphetamine, he had probable cause to continue his search under the automobile exception to the warrant requirement.

15

### 2. Standard of Review and Relevant Law

¶ 29    When we review a court's suppression ruling, we defer to the trial court's findings of fact as long as they are supported by competent evidence in the record, and we review the trial court's application of the law to those facts de novo. *People v. Delacruz*, 2016 CO 76, ¶ 12.

¶ 30    The Fourth Amendment of the United States Constitution and the Colorado Constitution forbid unreasonable searches and seizures. *Id.* at ¶ 13. Ordinarily, warrantless searches or seizures are unreasonable, unless an exception to the warrant requirement applies. *Id.* One such exception allows a police officer who has an articulable and objectively reasonable belief that an occupant of a vehicle may be armed and dangerous to conduct a protective search of all of the occupants as well as the passenger compartment of the vehicle for weapons. *Id.* at ¶ 14. Another exception — the automobile exception — enables an officer to search a vehicle if he has "probable cause to believe that the automobile contains evidence of a crime." *People v. Allen*, 2019 CO 88, ¶ 16 (quoting *People v. Zuniga*, 2016 CO 52, ¶ 14).

### 3. Analysis

#### a. The Protective Search

¶ 31 The trial court determined that Officer Whittenberg's initial search of the vehicle and its occupants was a permissible protective search. Giovanni claims that when Officer Whittenberg asked him to leave his door open it was an unconstitutional seizure. But an officer may search all of the occupants of a vehicle for weapons — as well as the vehicle's passenger compartment — as long as the officer has an articulable and objectively reasonable belief that one of the occupants may be armed and dangerous. *See Delacruz*, ¶ 14. Officer Whittenberg explained that he was asking Giovanni to keep his door open because he was worried about his and the other officers' safety. *See id.* at ¶ 15 ("During a protective search, police may physically restrain the vehicle's occupants, including through the use of handcuffs.").

¶ 32 Giovanni counters that the reasons the officer gave for suspecting either Giovanni or his passengers might have been armed and dangerous, particularly that Giovanni and his passengers were making "furtive gestures," aren't sufficient grounds to justify a protective search. We disagree for three reasons.

¶ 33    First, *Delacruz* supports the constitutionality of the search.  In

*Delacruz,* an officer was justified in searching a vehicle for weapons

after a knife fell out of the occupant's pocket.  *Id.* at ¶ 22.  Similarly,

Officer Whittenberg testified that he saw several knives, a baseball

bat, and a lockbox as he removed the occupants from the vehicle.

All of these observations supported Officer Whittenberg's reasonable

belief that one or more of the vehicle's occupants might have been

armed.

¶ 34    Second, the circumstances of the interaction support the

constitutionality of the search.  When Officer Whittenberg contacted

the vehicle's occupants, it was after two in the morning, and several

of the occupants — including Giovanni — appeared to be nervous,

avoided eye contact, and avoided questions from the officers.  And

because the passenger in the back seat admitted to stealing the

antifreeze, it was reasonable for the other occupants to assume he

would be arrested.  Several of these circumstances are relevant to

whether a police officer has articulable, objectively reasonable belief

that a person might be armed and dangerous.  *See People v. Smith,*

13 P.3d 300, 306 (Colo. 2000) (holding that relevant circumstances

include "the lateness of the hour . . . the reaction to the presence of police, and whether a companion is being arrested").

¶ 35    Finally, the occupants' furtive gestures are relevant, contrary to Giovanni's argument. "A furtive gesture in response to police contact during an investigatory stop may give rise to an objectively reasonable belief that the suspect is armed and dangerous, justifying a protective search." *People v. Brant*, 252 P.3d 459, 464 (Colo. 2011). Thus, the trial court's finding that the officer conducted a protective sweep is correct.

### b.    Probable Cause

¶ 36    Next, the trial court determined that once the officers had found what they suspected to be methamphetamine, they had probable cause to search the vehicle — and the lockbox — for drugs. Officers may search a vehicle if they have probable cause that the vehicle contains evidence of a crime. *Allen*, ¶ 16. Therefore, once Officer Whittenberg found what he suspected to be methamphetamine residue in the back seat, he had probable cause to suspect that the car held evidence of a drug crime as well.

¶ 37    Since at every stage of Officer Whittenberg's search of Giovanni and the vehicle he was acting under a valid exception to

the general requirement of obtaining a warrant prior to a search, we discern no error in the trial court's suppression ruling.

### C. Sanctions for Discovery Violations

¶ 38 Next, Giovanni argues that the trial court erred by not imposing more severe sanctions in response to the prosecution's discovery violations. He argues the court's failure to impose meaningful sanctions necessitates remand to the trial court with instructions to impose sanctions. We disagree.

### 1. Additional Facts

¶ 39 On July 22, just a few days before the trial was scheduled to begin, the trial court rescheduled the trial to begin on August 23 (about one week before the expiration of the six-month speedy trial deadline) because the prosecution disclosed a police report and endorsed a witness late. The same day that the court reset the trial, the prosecution made additional untimely disclosures to the defense, this time regarding the testing of the methamphetamine found in the vehicle. Those disclosures were made just thirty-two days before trial was scheduled to begin. This late discovery included evidence of color testing of the methamphetamine and a report regarding a different method of testing.

¶ 40   At a pretrial hearing on August 3, Giovanni informed the court about the prosecution's late disclosure of new information relating to the testing of the methamphetamine. The prosecutor explained that the People didn't intend to introduce the color testing results at trial, and that the rest of the July 22 late disclosure to the defense was due to a staff member's mistake in the district attorney's office. Giovanni initially requested that the court exclude the drug testing and its results in their entirety but later requested that the court dismiss the special offender charge as a sanction instead.

¶ 41   The court found that the late disclosure constituted a discovery violation but also found that Giovanni hadn't established any prejudice from the untimely disclosures, which were three days late. Accordingly, the court offered to reset the trial for August 30 — a week later — but Giovanni's counsel declined, saying that the extra week wouldn't be enough time to fully research the tardy disclosures. The court informed Giovanni that if he didn't want to reset the trial, the court wouldn't order any other sanctions.

2.   Standard of Review and Relevant Law

¶ 42   We review a trial court's decision on whether to sanction a party for a discovery violation for an abuse of discretion. *People v.*

21

*Tippet*, 2023 CO 61, ¶ 34.  A trial court's decision not to sanction a party is an abuse of discretion when it's "manifestly arbitrary, unreasonable, or unfair" or is based on a misapplication of the law. *People v. Montoya*, 2024 CO 20, ¶ 47

¶ 43     Crim. P. 16 obligates the prosecuting attorney to make reports or statements by experts available to the defense as soon as practicable, but not later than thirty-five days before trial.  Crim. P. 16(I)(a)(1)(III), (I)(b)(3).  When evaluating potential Rule 16 violations, the trial court must balance ordering the least severe sanction that will secure full compliance with the court's discovery orders. *Tippet*, ¶ 37.

¶ 44     A court must consider several factors when deciding discovery sanctions: "(1) the reason for and degree of culpability associated with the violation; (2) the extent of resulting prejudice to the other party; (3) any events after the violation that mitigate such prejudice; (4) reasonable and less drastic alternatives to exclusion; and (5) any other relevant facts."  *Id.* (quoting *People v. Cobb*, 962 P.2d 944, 949 (Colo. 1998)).

### 3. Analysis

¶ 45    All of the relevant considerations from *Tippet* for addressing a Rule 16 violation support that the court acted within its discretion when it decided not to impose sanctions.

¶ 46    The first factor the court must consider is whether the tardy disclosure was intentional. The record suggests that the delay in providing the discovery to Giovanni was an inadvertent mistake by office staff. The prosecutor clarified that the lack of disclosure wasn't the lab's fault, but that a legal assistant within the prosecutor's office had made an error. And the court acknowledged that explanation in its ruling. "It sounds like this was an error made within the district attorney's office, not through the laboratory, but within its office in assuring [sic] that this information was ultimately provided to the defense." Because the late disclosure wasn't intentional, this factor supports the court's decision.

¶ 47    Second, the court was required to determine whether the late disclosure prejudiced the defense. *See Tippet*, ¶ 37. The trial court determined that there was no prejudice since the prosecution wasn't planning to use some of the discovery, and Giovanni hadn't

shown prejudice for the rest. And Giovanni has not articulated any prejudice, either below or on appeal. Because the court explicitly considered whether the late discovery prejudiced Giovanni and decided with record support that there was no prejudice, this factor also supports the court's decision.

¶ 48 Third, the court was required to consider reasonable and less drastic alternatives to excluding the late-disclosed evidence. The court did just that when it offered Giovanni an extra week to make up for having received the discovery just thirty-two days before trial. This was a reasonable sanction for discovery being three days late, and it was less severe than Giovanni's suggested remedy — dismissal of his pending special offender charge. *See id.* This factor also supports the court's decision.

¶ 49 Fourth, the court was required to balance crafting the least restrictive sanction that would still ensure compliance with its discovery orders. The court offered Giovanni an extra week to research the new discovery. We have already determined that the week delay was appropriate given the disclosure was three days late, and it was less severe than Giovanni's requested sanction. And the court's decision to delay the trial by a week would have

discouraged the prosecution from making any more tardy disclosures because there would be no more time within the speedy trial window to delay the trial again.

¶ 50      All of these considerations support the court's decision not to order sanctions. Because the trial court's decision not to impose sanctions wasn't manifestly arbitrary, unreasonable, or unfair, we discern no grounds for reversal.

### D.      Expert Testimony

¶ 51      Next, Giovanni argues that the testimony of two police officers included improper expert opinion by a lay witness. He argues that the court's error in allowing this expert testimony by lay witnesses affected the verdict and a new trial is necessary. We disagree.

### 1.      Additional Facts

¶ 52      Officer Whittenberg testified that he found a methamphetamine pipe while he was searching the back seat of the vehicle, and that after he pried open the lockbox, he found another methamphetamine pipe and a crystalline substance that he recognized as methamphetamine based on his training and experience. Officer Whittenberg testified that he had seen methamphetamine pipes on more than 500 occasions and what he

suspected to be methamphetamine over 100 times. All of this testimony from Officer Whittenberg was admitted without objection.

¶ 53    Officer Tim Eha testified that part of his duties as an Aurora police officer was to test and process firearms such as the one found in the lockbox. He also testified about the process he uses to collect fingerprints from a weapon generally and the gun in this case, as follows:

> [Prosecutor]: With respect to this weapon, did you try to get fingerprints off of it?
>
> [Officer Eha]: Yes.
>
> Q: Tell us how that process works.
>
> A: We use a superglue machine which consists of a humidifier and a small little hotplate, like a burner plate, and then we put like a dime-sized drop of glue in a little tin and that tin sits on the burner plate. So once everything's inside that needs to be superglued, whatever it may be, the door will get closed and sealed. The machine will get turned on —
>
> [Defense Counsel]: Objection, improper expert testimony.

¶ 54    The court overruled the objection, reasoning that Officer Eha wasn't offering an opinion, but merely describing a process. Officer Eha continued:

26

[Officer Eha]: Basically once all items are in the superglue chamber and the superglue's on the burner plate you'll seal up the machine, close the door, seal it up and turn the machine on. It's very simple, you just hit a start button and that turns on the humidifier. Once it reaches, I believe it's 71 percent relative humidity, that's when the burning plate turns on and starts burning off the superglue. It basically — working together it makes a very light layer of superglue over all the items that are inside the chamber which will seal any kind of fingerprint in there.

[Prosecutor]: If you see anything, do you then take that and send it on to a lab where it is properly analyzed?

A: Yes.

Q: And did you see anything with respect to this gun?

A: No.

Q: Does that surprise you?

A: No.

Q: Why not?

[Defense Counsel]: Objection, improper expert opinion.

THE COURT: Overruled.

A: It doesn't surprise me only for the fact I've probably done over 500 guns as an estimate trying to fingerprint them and we only get

useable fingerprints maybe one percent of the time.

¶ 55    Officer Eha also testified that he fired the gun twice at a police range and it worked.  Giovanni's counsel didn't object to that testimony.

¶ 56    On cross-examination, Giovanni's counsel repeatedly elicited testimony from Officer Eha that he didn't have any special training or certification regarding fingerprint recovery.  Finally, Giovanni's counsel ended the cross-examination of Officer Eha by asking, "You've never been certified to collect fingerprints?"  Officer Eha answered, "No."

¶ 57    Two other witnesses who were qualified as experts testified regarding these topics.  Patricia Hopkins, the chemist who tested the crystalline substance found in the vehicle, testified that it tested positive for methamphetamine.  Hopkins also testified that DNA from the pipe found in the lockbox belonged to Giovanni.  Theresa Rhinehart, an expert in latent fingerprint examination, testified that finding fingerprints is rarer in Colorado than other states:

> [Prosecutor]: Do you find a fingerprint every single time?
>
> [Rhinehart]: Absolutely not.

Q: And is that surprising to you?

A: No, not in our climate.

Q: Why not?  What does that mean?

A: We're in a dry climate so fingerprints are 98 percent perspiration and two percent whatever else you've touched, so perspiration dries up here.  I don't know how many people here use lotion like I do frequently, so you'd have to continue to — unless someone's eating a greasy cheeseburger or Lay's potato chips, out here you don't find many fingerprints, but if you're in Florida with heavy humidity you might find more fingerprints.

### 2. Standard of Review and Relevant Law

¶ 58    Giovanni objected to Officer Eha's testimony about the process for recovering fingerprints and that he found fingerprints about one percent of the time on the grounds that it was expert testimony.  Accordingly, those claims are preserved.  Giovanni didn't object to any of Officer Whittenberg's testimony, or Officer Eha's testimony about firing the handgun at the police range; therefore those claims aren't preserved.

¶ 59    We review a trial court's evidentiary decisions for an abuse of discretion.  *Montoya*, ¶ 41.  A trial court "abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair," or if it misapplies the law.  *Id.* at ¶ 47.  We review Giovanni's preserved

claims of evidentiary error for harmless error. *Hagos*, ¶ 12. Under the harmless error standard of reversal, reversal is required only if the error "substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.* at ¶ 12 (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

¶ 60 We review the unpreserved claims for plain error. *Id.* at ¶ 14. Under the plain error standard of reversal, the error must be obvious and substantial. *Id.* An error is plain if it is so obviously erroneous that the trial court shouldn't have needed the benefit of an objection to avoid it. *People v. Sparks*, 2018 COA 1, ¶ 36. Plain error affects the substantial rights of the accused. *Hodges v. People*, 158 P.3d 922, 927 (Colo. 2007). Plain errors "so undermine[] the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *Id.*

¶ 61 While testifying, lay witnesses may only give opinions that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." CRE 701. Only a witness qualified as an expert may testify in the form of an

opinion or otherwise regarding "scientific, technical, or other specialized knowledge" that may help the trier of fact understand evidence in order "to determine a fact in issue." CRE 702.

### 3. Analysis

#### a. Officer Whittenberg's Testimony

¶ 62 We begin with Officer Whittenberg's testimony. Giovanni challenges two of his statements: (1) the crystalline substance he found in the car was methamphetamine, and (2) the pipe he found was a methamphetamine pipe that had been used to smoke methamphetamine.

¶ 63 First, Officer Whittenberg's testimony about the crystalline substance wasn't expert testimony because Officer Whittenberg never testified that the crystalline substance was methamphetamine, only that he *believed* that it was methamphetamine *at the time he was investigating* the vehicle:

> Prosecutor: Did the crystal-like substance, did you recognize that as what you believed to be methamphetamine based on your training and experience?
>
> Officer Whittenberg: I did.

If Officer Whittenberg had been testifying that he presently believed the crystalline substance was methamphetamine, his answer would

have been phrased in the present tense — "I do." So Officer Whittenberg was only testifying to his belief that the substance was methamphetamine at that particular time in his investigation (explaining the investigative steps he took). Because Officer Whittenberg wasn't offering his opinion that the substance was in fact methamphetamine, his statement isn't obviously expert testimony. *See* CRE 702.

¶ 64 Officer Whittenberg's second statement wasn't expert testimony either:

> Prosecutor: And is that how the safe looked when you first opened it?
>
> Officer Whittenberg: Yes, it does.
>
> . . . .
>
> Prosecutor: Can you describe for us what those items are?
>
> Officer Whittenberg: So that's a gun . . . a Leatherman case . . . that contained a baggie with crystalline substance and then above that is a pipe that's commonly used to smoke methamphetamine.
>
> Prosecutor: Can you tell whether or not that pipe has been used?
>
> Officer Whittenberg: I can.
>
> . . . .

Prosecutor: Did you also find a meth pipe in the back seat?

Officer Whittenberg: I did.

¶ 65 Giovanni argues that Officer Whittenberg's testimony is improper expert testimony because he testified that the pipe was commonly used to smoke methamphetamine, and that the pipe had been used.

¶ 66 But during this testimony Officer Whittenberg didn't say the pipe was used — only that he would be able to tell if it was. In any event, it isn't clear why a jury would need an expert to describe the difference between a pipe that appeared to have been used and one that had not been used.

¶ 67 So then, we are left with Officer Whittenberg's testimony that the pipe was a variety typically used for smoking methamphetamine. Remember that since Giovanni didn't object to this testimony, it's only error if it was obvious and substantial. *Hagos,* ¶ 18. While this is a closer call than the other testimony, it's still not obvious that this testimony is an expert opinion based on specialized training and experience — for three reasons. *See* CRE 702.

¶ 68    First, it's not clear that specialized training is required to notice the differences between a typical pipe for smoking tobacco and a pipe used to smoke methamphetamine. And because it isn't obvious that expert testimony is required, Officer Whittenberg's characterization of the pipe wasn't expert testimony, and it can't be plain error.

¶ 69    Second, the jury could have inferred the pipe was used for smoking methamphetamine without the benefit of Officer Whittenberg's testimony, since both pipes were found next to white crystalline substances and the substance found in the lockbox tested positive for methamphetamine according to the forensic chemist's testimony.

¶ 70    Third, Giovanni wasn't charged with possession of the pipe. Thus, Officer Whittenberg's statement can hardly be said to have undermined the fairness of the trial or affected his substantial rights. Therefore, since Officer Whittenberg's testimony regarding the pipe wasn't obviously an error or substantial, it can't be plain error.

¶ 71    And in any event, any potential error would be harmless. Officer Whittenberg's testimony that the crystalline substance he

found in the lockbox was methamphetamine was cumulative of Hopkin's properly admitted expert testimony confirming the substance was methamphetamine. And his testimony that the pipe had been used was cumulative of the fact that Giovanni's DNA had been found on the pipe found in the lockbox. "Where the improperly admitted lay testimony is cumulative of properly admitted expert testimony, there is no plain error." *People v. Douglas*, 2015 COA 155, ¶ 41. Therefore, the admission of Officer Whittenberg's testimony isn't grounds for reversal.

b. Officer Eha's Testimony

¶ 72 Next, Giovanni contends that three statements that Officer Eha made as part of his testimony constituted improper expert testimony since they were based on his experience and training as a police officer. Those statements by Officer Eha were: (1) his description of the procedure he used to test fire the handgun to demonstrate that it was functional; (2) that he had recovered fingerprints from only about one percent of the approximately 500 guns that he had processed; and (3) his description of the procedure for using hot glue to recover fingerprints.

¶ 73    Because Giovanni didn't object to the first statement, we review it for plain error.  Giovanni contends that Officer Eha's testimony describing how he fired the gun twice at the police range was expert testimony.  But Giovanni doesn't describe — and it isn't obvious — what specialized knowledge a layperson would need to distinguish between a functioning and nonfunctioning handgun. *See* CRE 702.  Therefore, we don't perceive any expert testimony in this portion of Officer Eha's testimony.  Accordingly, we can't say the court erred, much less plainly erred, by allowing this testimony.

¶ 74    Next, because Giovanni objected to Officer Eha's other two statements, we review the admission of those statements for an abuse of discretion.

¶ 75    Officer Eha's statement that, in his experience, he had only recovered fingerprints from approximately one percent of the guns he had processed wasn't expert testimony because Officer Eha wasn't offering an opinion; instead he was merely recounting his experience.  Because Officer Eha's statement wasn't an opinion, we can't say that the trial court abused its discretion by admitting it. (In contrast, Rhinehart's explanation that Colorado's dry climate was the reason for this difficulty is an example of the type of

"scientific, technical, or other specialized knowledge" contemplated by CRE 702. That sort of explanation was notably absent from Officer Eha's testimony.)

¶ 76 Next, we consider Officer Eha's statement describing the process by which the machine heated up glue to lift any fingerprints from the handgun. Giovanni argues that because Officer Eha testified to his training and qualifications, Officer Eha converted his testimony from lay to expert. But Officer Eha never offered any opinions as part of his testimony about the process for lifting fingerprints from a gun. He simply described the process — as the trial court acknowledged in its ruling. Therefore, since Officer Eha's testimony wasn't improper expert opinion, we discern no error in the trial court's decision to admit this testimony.

## E. Cumulative Error

¶ 77 Finally, Giovanni argues that the cumulative prejudice of the alleged discovery violations and improper expert testimony requires reversal. Giovanni argues that, because of the late discovery, his trial counsel was unable to properly prepare to cross-examine Hopkins, the forensic chemist. He argues that Hopkins shouldn't have been allowed to testify as a result. Giovanni also argues that

Hopkins' testimony was improperly bolstered by Officer Whittenberg's testimony that the crystalline substance was methamphetamine. We disagree for two reasons.

¶ 78 First, recall that prosecutors must disclose expert reports no later than thirty-five days before trial. Here, the prosecutor disclosed the report thirty-two days before trial — three days late. So the prejudice to Giovanni is that his counsel had three fewer days than she was entitled to in order to prepare for cross-examination. The trial court offered to rectify that prejudice by delaying the trial for a week. But Giovanni refused that remedy.

¶ 79 Second, we have already determined that Officer Whittenberg didn't testify at trial that the crystalline substance was, in fact, methamphetamine. Instead, it's clear from the record that Officer Whittenberg was referring to his belief during the course of his investigation. Because Officer Whittenberg didn't testify that the substance was actually methamphetamine, his testimony didn't directly support Hopkin's testimony.

¶ 80 To reverse based on cumulative error, we must find multiple errors that collectively prejudice the substantial rights of the defendant. *Howard-Walker v. People*, 2019 CO 69, ¶ 25. Here,

however, the only prejudice to Giovanni was the discovery that was three days late — a prejudice that the court offered to rectify in full. Therefore, we reject Giovanni's cumulative error argument.

## III.   Disposition

¶ 81     The judgment is affirmed.

JUSTICE MARTINEZ and JUDGE BERNARD concur.